**INTER–TEL TECHNOLOGIES, INC. and Inter–Tel, Inc., Appellants,**

v.

**LINN STATION PROPERTIES, LLC and Integrated Telecom Services Corp., Appellees.**

No. 2009–SC–000819–DG.

Supreme Court of Kentucky.

Feb. 23, 2012.

Scott David Spiegel, William Henry Mooney, Lynch, Cox, Gilman & Goodman, PSC, Louisville, KY, Counsel for Appellants.

Ridley M. Sandidge, Jr., Reed, Weitkamp, Schell & Vice, PLLC, Louisville, KY, Counsel for Appellee, Linn Station Properties, LLC.

Opinion of the Court by Justice ABRAMSON.

■ Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice. The leading Kentucky case on piercing, *White v. Winchester Land Development Corp.*, 584 S.W.2d 56 (Ky.App.1979), like decisions from courts across the country, refers to this two-part test as the "alter ego" test. In recent years, courts and commentators have recognized piercing by using various tests and formulations, most commonly the "alter ego" and "instrumentality" tests, and by identifying common characteristics of corporations which have forfeited the right to separate legal existence, the "equities" assessment referenced in *White*, 584 S.W.2d at 61. This case requires us to consider this important doctrine in the context of an increasingly common scenario, a creditor's attempt to collect on debt incurred by a wholly-owned subsidiary where the subsidiary has been deprived of all income and rendered assetless by the acts of its parent (and in this case also grandparent) corporation. While piercing the corporate veil, as one leading commentator has aptly noted, is a doctrine that can be characterized by "frustrating fluidity," Stephen B. Presser, *Piercing the Corporate Veil* 9 (2011), we have no doubt that the case before us presents a clear example of circumstances under which entitlement to the privilege of separate corporate existence should be forfeited.

Integrated Telecom Services Corp. (ITS) is a wholly-owned subsidiary of Inter–Tel Technologies, Inc. (Technologies), which in turn is a wholly-owned subsidiary of Inter–Tel, Inc. (Inter–Tel). Inter–Tel, the grandparent corporation, designs, manufactures, sells and services telecommunications systems through its subsidiaries and affiliates. Technologies, the parent corporation, is the retail division of Inter–Tel. ITS, the subsidiary, was the company's first retail branch in Kentucky, selling Inter–Tel's telecommunications products from an office building it leased from Linn Station Properties, LLC (Linn Station). Linn Station obtained a default judgment against ITS after ITS breached the lease agreement, but was unable to enforce the

judgment because ITS was, by then, a defunct corporation without any assets. Linn Station then sued ITS, Technologies and Inter–Tel, seeking to pierce the corporate veil and establish Technologies and Inter–Tel's liability for the judgment. The trial court granted summary judgment to Linn Station and the Court of Appeals affirmed, finding it appropriate to pierce the corporate veil where the evidence showed ITS was merely an instrumentality or alter ego of Technologies and Inter–Tel, operated by them to achieve tax benefits and avoid various liabilities. Technologies and Inter–Tel appealed and are now before this Court on discretionary review. Because Technologies and Inter–Tel exercised complete dominion and control over ITS, depriving it of a separate existence, and both parent and grandparent derived the benefits associated with the Linn Station lease while rendering ITS an income-less and asset-less shell incapable of meeting its lease obligations, the trial court and Court of Appeals properly pierced the ITS corporate veil to hold Technologies and Inter–Tel liable for the debt to Linn Station.

### RELEVANT FACTS

On December 4, 1997, ITS, a Kentucky corporation, leased an office building on Linn Station Road in Louisville, Kentucky from Caldwell R. Willig, the then-owner of the building and a principal shareholder of ITS. The lease, which was to run from January 1, 1998 to December 31, 2003, stated that ITS was responsible for all non-structural repairs to the interior of the building. The lease also contained an arbitration provision for all disputes arising under the lease, excepting those concerning the tenant's default in rent payment.

On July 2, 1998, Technologies, an Arizona corporation, acquired ITS by purchasing all of ITS's stock; the purchase price for the stock was paid by Technologies' parent company, Inter–Tel. Inter–Tel, also an Arizona corporation, is a public holding company that conducts business through its various subsidiaries and affiliates. As noted, Inter–Tel is in the business of designing, manufacturing, selling and servicing telecommunications systems and related services primarily to business, as opposed to individual, customers. Technologies operates as the company's retail branch, selling Inter–Tel's telecommunications hardware and software applications to customers. By and through Technologies, the former ITS operations became Inter–Tel's first direct sales operations in Kentucky, with offices in Louisville and Lexington.

Linn Station Properties purchased the Linn Station Road office building from Caldwell Willig on July 29, 1999 and thus became lessor of the ITS premises. In February 2002, Linn Station discovered ITS had not maintained the property as required under the lease and sent ITS a letter informing ITS the repairs would cost $91,398.00. ITS never made any repairs and abandoned the property in May 2002. Linn Station then wrote a letter to ITS regarding its non-payment of rent and abandonment of the premises and demanded compliance with the lease. Linn Station also initiated proceedings with the American Arbitration Association to resolve the dispute over ITS's failure to maintain and repair the premises. General Counsel for Inter–Tel and Technologies, John Gardner, responded and informed Linn Station that ITS was the only lessee on the lease and the parent company, Technologies, had neither guaranteed nor agreed to assume liability for the lease and would not pay any damages. Gardner further informed Linn Station that ITS was, by then, a defunct corporation without any assets and, as such, had no need to participate in any arbitration or legal proceeding.

Gardner invited Linn Station to take a default judgment against ITS.

On June 19, 2002, Linn Station filed suit against ITS, seeking damages for failure to repair and maintain the premises and for unpaid rent. ITS was properly served but failed to respond, and on August 12, 2002, a default judgment was entered against ITS for $332,900.00 plus interest. After repeated, unsuccessful attempts to satisfy the judgment against ITS, on June 20, 2003 Linn Station sued ITS, Technologies and Inter–Tel to pierce the corporate veil and establish Inter–Tel and Technologies' liability for the judgment against ITS.[1] Eventually, the trial court concluded ITS was being maintained for tax purposes, rather than operating purposes, which arrangement provided a benefit to the company but unfairly harmed Linn Station. The trial court found that the parent company had "co-mingle[d]" its corporate entity with its subsidiary but then tried "to hide behind the corporate shield of liability" by claiming the subsidiary was a separate entity. The trial court concluded that the corporate veil should be pierced given the circumstances and proceeded to grant summary judgment to Linn Station and order Inter–Tel and Technologies to pay Linn Station the amount of the judgment.

The Court of Appeals affirmed the trial court. Relying on *White,* the Court of Appeals conducted a thorough analysis and found ITS was merely an' instrumentality or alter ego of Inter–Tel and Technologies. The Court of Appeals concluded that after it was acquired by Technologies, ITS no longer possessed any financial independence, ITS could not maintain a bank account, hold any funds or pay any bills. All

of ITS's regional offices were transformed from independent dealers of communications equipment into direct sales "branches" of Inter–Tel. ITS employees became employees of Inter–Tel and were paid by Inter–Tel from its headquarters in Arizona. When a customer purchased a telecommunications system from ITS the payment went directly into a "lock box" or depository account controlled by Inter–Tel. Once the funds were placed in this account they belonged to Inter–Tel. Inter–Tel paid all the vendors who provided ITS with goods and services. All of ITS's inventory was provided by another Inter–Tel subsidiary, which was compensated for the inventory through what the Inter–Tel corporate controller described as "intercompany transactions, credits, and whatnot." Inter–Tel paid ITS's rent for the Linn Station Road property from the time Technologies acquired ITS until ITS abandoned the premises in 2002. Further, Inter–Tel and Technologies were the named insureds listed on the property damage insurance for ITS's premises on Linn Station Road.

ITS, Technologies and Inter–Tel also failed to observe standard corporate formalities and processes. ITS did not hold an annual board of directors or shareholders meeting from 1999 through 2002. Nor did Technologies hold an annual board of directors or shareholders meeting from 1998 through 2002. Appellants produced copies of unanimous written consent forms waiving these meetings, but none of the copies were signed or dated. The original waivers were purportedly lost in the course of a separate law suit, and Appellants could not produce any evidence that they had been properly executed. In 1999,

---

1. Inter–Tel and Technologies sought an order compelling arbitration, which the trial court initially granted but later vacated. The order vacating was appealed to the Court of Appeals which affirmed in a May 2008 opinion that is relevant to disposition of one of the issues now raised by Inter–Tel and Technologies. That opinion is addressed *infra.*

2000, 2001 and 2002, ITS and Technologies had identical boards of directors,[2] and each ITS and Technologies director served as an officer of Inter–Tel. During those same years, the President and CEO of Inter–Tel served on the boards of ITS, Technologies and Inter–Tel. Also during that four-year period, all of ITS's officers served as officers of both Technologies and Inter–Tel.

In addition, ITS, Technologies and Inter–Tel appear to have treated themselves interchangeably with respect to tax returns. While all Inter–Tel business conducted in Kentucky since 2001 was performed by ITS in its own name, it was Inter–Tel, Technologies, and another Inter–Tel subsidiary that filed sales and use tax returns with the Kentucky Revenue Cabinet in 2001, 2002 and 2003. According to Inter–Tel's tax manager, Susan Sherman, the vast majority of sales in Kentucky would have been made by ITS, yet ITS did not file any Kentucky sales and use tax returns in 2001, 2002 or 2003. Technologies, Inter–Tel, and another Inter–Tel subsidiary, however, reported significant sales in Kentucky during those years on the aforementioned returns. Sherman could not explain why the sales and use tax returns were filed in the names of corporate entities other than ITS. In 2002, the Kentucky Revenue Cabinet began a sales and use tax audit of Technologies. During the audit, the Revenue Cabinet announced a tax amnesty program, which allowed applications by companies under audit. Despite the fact that

the audit was of Technologies, the company filed a tax amnesty application in the name of "Integrated Telecom Services, Inc. d/b/a Inter–Tel Technologies, Inc." The application was accepted and it was actually Inter–Tel that paid the $15,485.60 amnesty payment. In 2001, Technologies reported in its own name ITS's intangible and tangible personal property at the Linn Station Road address. However, Sherman, the Inter–Tel tax manager, stated Technologies did not own any property at that address.

After the default judgment was entered against ITS in the fall of 2002, Inter–Tel filed a Form UCC–1 financing statement that recorded Technologies' alleged security interest in ITS property and covered "all contract rights, accounts, accounts receivable, inventory, leasehold improvements, personal property, cash, proceeds of collateral or equivalents." The consideration paid to ITS in exchange for the security interest was ten dollars and other good and valuable consideration, including but not limited to assumption of debt by Technologies on behalf of ITS. There was no written security agreement between ITS and Technologies associated with the financing statement. According to Gardner, the General Counsel for Inter–Tel and Technologies, the financing statement was filed to protect from creditors the company's interest in assets that were "on the books" as being owned by ITS instead of Technologies, which he said was actually "the business doing business there." And while the financing statement claimed to

---

2. The evidence in the record on this point is conflicting. The unanimous written consent forms provided by Appellants, attached as exhibits four through seven to Gardner's deposition, indicate ITS and Technologies' boards of directors were identical from 1999 through 2002. However, Appellants' Answer to Appellees' Interrogatories and Request for Production of Documents, interrogatory number four, indicates that two of the three directors for ITS and Technologies were identical from 1999 through 2001 and the boards were completely identical in 2002. The fact that Appellants supplied such self-contradicting information about ITS and Technologies is a testament to the confusing nature of Inter–Tel's corporate structure.

encumber accounts receivable, Gardner admitted ITS did not have any accounts receivable after July 2, 1998. In his words, "the books show ITS has ownership of some accounts receivable and some inventory and some fixed assets," all of which Inter–Tel provided to ITS. However, "that ownership [was] maintained for tax purposes and not for operating purposes . . . Inter–Tel Technologies [was] the operating entity at that location." Gardner further explained that while Technologies may have assumed some of ITS's debt, the obligation to pay rent to Linn Station was not one such debt.

Both Gardner and Sherman explained ITS was continued as a separate entity after its acquisition by Technologies so that Inter–Tel could gain a tax advantage by offsetting income from other subsidiaries against ITS's net operating loss. Any assets that Inter–Tel provided to ITS, such as accounts receivable, inventory and fixed assets, were for tax purposes not operating purposes.

The Court of Appeals acknowledged that, while any of these factors alone would not justify piercing the corporate veil, taken together they indicate ITS was merely a shell corporation used by its parent companies to avoid various liabilities, and piercing the corporate veil was justified to avoid subjecting Linn Station to unjust loss. Now before this Court on discretionary review, Appellants Inter–Tel and Technologies argue the Court of Appeals failed to address whether a default judgment is void as to those who were not parties to the default action. They also claim the Court of Appeals decision creates a broad, equity-based standard for piercing the corporate veil that is contrary to prior law and bound to have a detrimental effect. We begin with the doctrine of veil-piercing.

## ANALYSIS

### I. The Trial Court Properly Pierced the ITS Corporate Veil

#### A. Piercing the Corporate Veil Generally

Limited liability for corporate entities is described by some scholars as springing from both democratic and economic principles in the early days of the United States. The "imposition of limited liability was perceived as a means of encouraging the small-scale entrepreneur, and of keeping entry into business markets competitive and democratic," assuring that the corporate world was not dominated by industrialists who had the immense personal wealth to withstand any business risk. Presser, *supra*, at 19. The economic rationale was that the public would benefit from investment by shareholders who would be willing to take risks in industry, manufacturing and general commercial development if personal liability could be avoided should their ventures not succeed. *Id.* at 21. By the twentieth century, deliberate misuse of the corporate form by shareholders who were either individuals or other corporations had led courts to authorize piercing the corporate veil.

One of the most notable early piercing cases, *Berkey v. Third Ave. Railway Co.*, 244 N.Y. 84, 155 N.E. 58 (1926), involved a parent-subsidiary relationship and was authored by Judge Benjamin Cardozo. Mrs. Berkey was injured on a street car operated by Forty–Second Street Railway Co. but she sued Third Avenue Railway Co., the parent which owned substantially all of the Forty–Second Street stock. Among other factors that raised questions about Forty–Second Street's separate existence were the commonality of officers and directors between the two corporations, the leasing of the streetcars by the subsidiary from the parent with the parent's name

prominently displayed on the vehicles and the payment of the subsidiary's executives by the parent. The Court ultimately declined to pierce the corporate veil of Forty–Second Street, which had its own banks accounts and employees as well as assets in excess of its debts and liabilities. However, Judge Cardozo noted that "[w]e say at times that the corporate entity will be ignored when the parent corporation operates a business through a subsidiary which is characterized as an 'alias' or 'dummy.' " *Berkey*, 155 N.E. at 61.

In the ensuing years courts have invoked other, often colorful, terms in an attempt to capture the concept of loss of separate corporate existence including "dry shell," "puppet," "stooge," "conduit" and "marionette," among dozens of others. Peter B. Oh, *Veil–Piercing*, 89 Tex. L.Rev. 81, 83 n. 7 (2010). This Court, then the Court of Appeals, joined in the vivid descriptions in one of the Commonwealth's earliest piercing cases, *Veterans Service Club v. Sweeney*, 252 S.W.2d 25 (Ky.1952), a case with somewhat curious facts. Mrs. Sweeney apparently gambled $1,535.00 of family funds in games of chance at the "veterans" club, causing her displeased husband to bring suit under a Kentucky anti-gaming statute that allowed "the loser or his creditor" to recover treble damages against gambling winners. Without extensive discussion, this Court found the Chancellor correctly "swept aside the legal fiction of separate corporate personality" to hold the three individual incorporators of the Veterans Service Club liable for their

"unlawful acts." 252 S.W.2d at 27. In so doing, the Court stated:

> The incorporation was but a cloak or mask devised by the incorporators to cover their illegal acts of gambling and to shield them from the consequences of these acts. In such a case the corporate form will be disregarded to the same extent as if it were nonexistent and liability will be fixed upon those who attempt to employ this type of instrumentality as a protective measure for their unlawful practices. It is a stern but just maxim of law that fraud vitiates everything into which it enters.

*Id.* While *Veterans Service Club* referred to the pierced corporation as an "instrumentality," the first extended discussion of veil-piercing, including the leading "alter ego" and "instrumentality" tests and the rationale for this equitable doctrine, came almost thirty years later in what is still viewed as Kentucky's seminal and leading case on the subject, *White v. Winchester Land Development Corp.*, 584 S.W.2d 56 (Ky.App.1979).[3]

**B. *White v. Winchester Land Development Co.***

While the facts in *White* are not as colorful as those in *Veterans Service Club*, they too are a bit different from those of a typical piercing case. Mr. and Mrs. White signed a promissory note for a personal loan with The Winchester Bank, a loan secured by shares of Allied Stores stock owned by Mr. White's mother. Shortly after their personal loan was paid off, the Whites incorporated The White House, Inc., a card and gift shop which unfortu-

---

**3.** For a compilation and brief discussion of earlier decisions of Kentucky's highest court regarding piercing the corporate veil, see *Poyner v. Lear Siegler, Inc.*, 542 F.2d 955 (6th Cir.1976). The Sixth Circuit summarized Kentucky law pre-*White* by noting that ownership and control of the corporation by the persons sought to be held liable was necessary but not sufficient by itself: "Before a Kentucky court will disregard the corporate entity, it must also determine that the artificial personality serves to shield individuals from legal responsibility for fraudulent or criminal acts, or that the form of organization is subversive of public policy." 542 F.2d at 958 (citations omitted).

nately failed approximately two years later. The corporation also had borrowed funds from The Winchester Bank, through two separate notes, so after the corporate insolvency the bank filed suit, claiming entitlement to the Allied Stores stock which had secured the original personal loan. The bank maintained that The White House, Inc. was a mere sham and the Whites should be held personally liable despite having signed the second and third notes in their corporate capacities as President and Secretary/Treasurer of the corporation. 584 S.W.2d at 59.

Judge Boyce Martin, writing for the appellate panel, readily distinguished the facts before the court from the fraudulent acts in *Zanone Co. v. Standard Oil Co.,* 322 S.W.2d 710, 711 (Ky.1959), a case involving the transfer of assets from a debt-ridden partnership to a new corporation for no consideration and, as one shareholder frankly described it, "to be able to do business and not be entangled with the past." While the Whites had engaged in no such fraudulent conduct, Judge Martin noted that the protection of corporate limited liability could still be lost in "specific, unusual circumstances." 584 S.W.2d at 61 (citing *Zubik v. Zubik,* 384 F.2d 267, 273 (3d Cir.1967)). The *White* Court relied upon a law review article by Professor Rutheford Campbell that addressed three basic approaches to veil-piercing, generally referred to as the instrumentality theory, the alter ego theory and the equity formulation. Rutheford Campbell, *Limited Liability for Corporate Shareholders: Myth or Matter–of–Fact,* 63 Ky. L.J. 23, 33 (1975). The Court examined each test in turn and we review them in some detail because they remain common statements of veil-piercing criteria. Judge Martin questioned whether the three theories were "indeed … distinct," 584 S.W.2d at 61, and, in most ways, they are not.

The instrumentality theory requires the co-existence of three elements: "(1) that the corporation was a mere instrumentality of the shareholder; (2) that the shareholder exercised control over the corporation in such a way as to defraud or to harm the plaintiff; and (3) that a refusal to disregard the corporate entity would subject the plaintiff to unjust loss." *Id.* While the Whites were certainly the only shareholders there was no proof of misuse of the corporation and, most importantly for the Court, there was no evidence of fraud in the corporation's dealings with the bank and the bank's loss was not unjust because the bank could have secured itself by "requiring the Whites to sign those notes in their individual and separate capacities." *Id.* Notably, the Court did not address the "or to harm" language of the second element, which obviously refers to something less than fraud.

The alter ego test was equally unavailing for the bank for essentially the same reasons. This formulation involves two elements: "(1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and (2) that the facts are such that an adherence to normal attributes, *viz,* treatment as a separate entity, of separate corporate existence would sanction a fraud or promote injustice." 584 S.W.2d at 61–62. Once again the *White* Court focused on the absence of fraudulent conduct without addressing the non-fraud language, in this test the "promote injustice" consideration. However, the facts also failed the alter ego test because the Whites had observed "the strictures of proper corporate existence," going so far as to adopt a corporate resolution that authorized borrowing from The Winchester Bank. *Id.* at 62.

The final equity formulation reflected acknowledgment of those factors which of-

ten appeared in a successful veil-piercing case, factors that focus on "close-connectedness" as well as "unfair dealings." *Id.* Citing William M. Fletcher, 1 *Cyclopedia of the Law of Private Corporations* § 41 (1974), the *White* Court opined that piercing should occur only in the presence of a combination of (1) undercapitalization, (2) failure to observe corporate formalities, (3) the corporation not paying or overpaying dividends, (4) siphoning of corporate funds by a shareholder and (5) personal guarantees of corporate debt by majority shareholders. *Id.* Finding absolutely no evidence to support factors (2) through (5), the *White* Court addressed the undercapitalization factor by noting that Kentucky law does not require a minimum amount of paid-in capital and, in any event, the bank "had knowledge of the financial status of the corporation and could have protected itself." *Id.* at 63. Because the facts failed to satisfy any of the three tests for piercing the corporate veil, the bank had no recourse under that doctrine, although the case was remanded for further development of the bank's claim that the corporate notes were a novation or renewal of the Whites' original personal note.

## C. Post-*White* in the Commonwealth and Beyond

Both before and since *White,* this Court has only focused on veil-piercing in passing. *E.g., Morgan v. O'Neil,* 652 S.W.2d 83 (Ky.1983) (declining to pierce where the plaintiff complained of questionable acts by a sole shareholder but failed specifically to state a piercing claim in the complaint); *Natural Res. and Envtl. Prot. Cabinet v. Williams,* 768 S.W.2d 47 (Ky.1989) (piercing the veil to hold a sole shareholder of a mining corporation responsible for a mining violation but relying on the individual liability language of the penalty statute instead of the common law doctrine); *Lewis LP Gas, Inc. v. Lambert,* 113 S.W.3d

171, 176 (Ky.2003) (disallowing an alter ego theory to pierce the corporate veil in order to reach corporate assets in a marital dissolution suit, noting that alter ego requires use of the corporation "to invoke fraudulent protection against personal liability"). Consequently, the trial courts and federal courts applying Kentucky law have relied on *White* for Kentucky's stance on veil-piercing.

In *United States v. WRW Corp.,* 986 F.2d 138, 143 (6th Cir.1993), the Court pierced the corporate veil, focusing on the five factors in the *White* equity formulation but most particularly the fact that WRW was undercapitalized at the time of incorporation, $3000.00 being "insufficient to pay normal expenses associated with the operation of a coal mine." Additionally, WRW had not observed corporate formalities, the individual shareholders had commingled personal and corporate funds and some of WRW's debt was guaranteed by the individual shareholders. With these three factors present, the Sixth Circuit was unpersuaded that the absence of evidence as to the other two factors, that the individual defendants received dividends or siphoned corporate funds, precluded piercing. More recently, in *Sudamax Industria e Comercio de Cigarros, Ltda v. Buttes & Ashes, Inc.,* 516 F.Supp.2d 841, 847 (W.D.Ky.2007), the federal district court declined to pierce the veil of a limited liability company that the plaintiff insisted was part of a "web" of organizations, each the alter ego of the other. As to the separate entity existence factor, the LLC observed corporate formalities, maintained its own bank accounts, filed corporate tax returns and filed certain financial statements required by law. There was no evidence of commingling of funds among the entities, guarantees of the LLC debt by others or undercapitalization. Interestingly, the district court employed the two-part alter ego test from *White* and also

construed the language in the second factor, "would sanction a fraud or promote injustice," as requiring a showing of fraud. 516 F.Supp.2d at 849.

Beyond Kentucky, veil-piercing generally focuses on the same instrumentality, alter ego and equities factors tests explored in *White*, with the alter ego formulation appearing to be the most common test, always employed in conjunction with consideration of various equities factors.[4] The Seventh Circuit Court of Appeals, when applying Illinois law, uses the two-part alter ego test and considers the following factors under the first prong of that test:

> (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.

*Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir.2008) (citing *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 298 Ill. Dec. 654, 840 N.E.2d 767, 778 (2005)). This expanded list is more reflective of the evolving considerations as to the so-called equities factors than the five simple factors in *White*. Perhaps the most straightfor-ward listing, employed in whole or part by various jurisdictions, is derived from Fredrick J. Powell, *Parent and Subsidiary Corporations: Liability of a Parent Corporation for the Obligations of its Subsidiaries* (1931), a treatise discussed by Professor Presser in *Piercing the Corporate Veil, supra*, at 41–42:

a) Does the parent own all or most of stock of the subsidiary?

b) Do the parent and subsidiary corporations have common directors or officers?

c) Does the parent corporation finance the subsidiary?

d) Did the parent corporation subscribe to all of the capital stock of the subsidiary or otherwise cause its incorporation?

e) Does the subsidiary have grossly inadequate capital?

f) Does the parent pay the salaries and other expenses or losses of the subsidiary?

g) Does the subsidiary do no business except with the parent or does the subsidiary have no assets except those conveyed to it by the parent?

h) Is the subsidiary described by the parent (in papers or statements) as a department or division of the parent or is the business or financial responsibility of the subsidiary referred to as the parent corporation's own?

i) Does the parent use the property of the subsidiary as its own?

j) Do the directors or executives fail to act independently in the interest of

---

4. Many commentators share Judge Martin's view in *White*, 584 S.W.2d at 61, that the instrumentality and alter ego tests are essentially interchangeable. "Although bearing different names and formulated with different metaphors, the instrumentality and alter ego doctrines are virtually indistinguishable and should be regarded as doctrinal equivalents." 1 Phillip I. Blumberg, et al., *Blumberg on Corporate Groups* § 11.01[F] (2d ed.2012). Thus the prevalence of one over the other is only evidence of a distinction without a real difference.

the subsidiary, and do they instead take orders from the parent, and act in the parent's interest?

k) Are the formal legal requirements of the subsidiary not observed?

■ While some scholars are critical of the laundry list approach to assessing corporate separateness, one referring to it as "piercing by checklist," Blumberg, *supra*, § 11.03[A], courts and commentators alike recognize that the checklist approach focuses on factors most often bearing on the loss of separate entity existence. As Blumberg notes, courts give the most emphasis to "grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." *Id.* We believe that these are the most critical factors and that Kentucky courts should consider the aforementioned expanded lists instead of focusing solely on the five factors identified more than thirty years ago in *White*.

Seventh Circuit precedent is helpful in illustrating another way in which *White* should be revised and updated. In the leading case of *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), also applying Illinois law, the Court emphasized that either sanctioning fraud or promoting injustice is sufficient to satis-

fy the second prong of the alter ego test. However, the injustice must be some wrong beyond the creditor's mere inability to collect from the corporate debtor. *Id.* at 522–23. The *Sea–Land* Court's notable examples of injustice include where "a party would be unjustly enriched; [where] a parent corporation that caused a sub's liabilities and its inability to pay for them would escape those liabilities; or an intentional scheme to squirrel assets into a liability-free corporation while heaping liabilities upon an asset-free corporation would be successful." 941 F.2d at 524.

■ *Sea–Land* is instructive because it typifies modern piercing jurisprudence which almost uniformly dispenses with any requirement of actual fraud. "A handful of jurisdictions, such as New Mexico, still require actual fraud, and there are a few others in which the courts still have not decided whether it is required, but American jurisdictions today overwhelmingly accept that morally culpable conduct short of actual fraud satisfies the second element...." Blumberg, *supra*, § 11.01[C].[5] The alter ego test language employed in *White* and by most jurisdictions expressly refers to "promoting injustice" and, indeed, piercing should not be limited to instances where all the elements of a common law fraud claim can be established.[6] The examples identified in *Sea–Land* are illustrative of schemes and circumstances that, while not constituting fraud, merit

5. *See also Wm. Passalacqua Bldrs., Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131 (2d Cir.1991); *Strawbridge v. Sugar Mtn. Resort, Inc.*, 243 F.Supp.2d 472, 476 (W.D.N.C. 2003) ("Fraud, itself, is not required in order to pierce the corporate veil."); *Jablonsky v. Klemm*, 377 N.W.2d 560, 563 (N.D.1985) ("[P]roof of fraud is not a necessary prerequisite for disregarding the corporate entity."); *Equity Trust Co. Custodian ex rel. Eisenmenger IRA v. Cole*, 766 N.W.2d 334, 340 (Minn.Ct. App.2009) ("[P]roof of strict common law fraud is not required, but ... evidence that

the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented.").

6. In any event, as one commentator has noted: "Actual cases of fraud do not require veil-piercing because the creditor can simply sue the responsible shareholders directly in tort." David Millon, *The Still–Elusive Quest to Make Sense of Veil–Piercing*, 89 Tex. L.Rev. See Also 15, 22 (2010).

piercing where there is also evidence that the debtor corporation has lost its separate identity. There are other scenarios which also qualify, as reflected in any survey of veil-piercing cases. Thus, to the extent *White* can be read to require evidence of actual fraud before an entity's veil is pierced, it is overruled. We agree with the Seventh Circuit, however, that the injustice must be something beyond the mere inability to collect a debt from the corporation.

■ Finally, while the Kentucky General Assembly gave statutory recognition to the veil-piercing doctrine in Kentucky Revised Statute (KRS) 271B.6–220(2),[7] it remains an equitable doctrine to be applied by the courts. *Thomas J. Schultz v. General Electric Healthcare Financial Services, Inc.*, 360 S.W.3d 171 (Ky.2012). A Kentucky trial court may proceed under the traditional alter ego formulation or the instrumentality theory because the tests are essentially interchangeable. Each resolves to two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness *and* (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice. In assessing the first element, the courts should look beyond the five factors enumerated in *White* to the more expansive lists of factors discussed *supra.* As to the second element, the trial court should state specifically the fraud or injustice that would be sanctioned if the court declined to pierce the corporate veil.

**D. Justification for Piercing ITS's Corporate Veil**

■ The trial court and Court of Appeals were correct in concluding the undisputed facts of this case justified piercing ITS's corporate veil. ITS lost all semblance of separate corporate existence and through the joint acts of Technologies and Inter–Tel was rendered income-less and asset-less. Their diversion of ITS's corporate income and transfer of ITS's corporate assets for their own benefit provides the extra "injustice" discussed in *Sea–Land,* something more than simply a creditor's inability to collect a debt from ITS. In brief, the alter ego test is satisfied and numerous of the equities factors are present. Before examining the facts more closely, we note that the case is before us on a grant of summary judgment in favor of Linn Station. As always, the standard of review on appeal of summary judgment is whether the trial court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Hammons v. Hammons,* 327 S.W.3d 444 (Ky.2010); CR 56.03. There has been no suggestion that there are issues of material fact in this case, the only issue being simply the legal effect of those undisputed facts. As for legal conclusions, of course, we review the trial court's summary judgment ruling and the Court of Appeals opinion *de novo. Blankenship v. Collier,* 302 S.W.3d 665 (Ky.2010).

In determining that piercing is justified, it is appropriate to consider the actions and conduct of ITS and both the parent corporation, Technologies, and the grandparent, Inter–Tel. The Inter–Tel group insists that the parent and grandparent should not be viewed collectively but must be accorded separate recognition and only

---

7. KRS 271B.6–220(2) provides, "Unless otherwise provided in the articles of incorporation, a shareholder of a corporation shall not be personally liable for the acts or debts of the corporation except that he may become personally liable by reason of his own acts or conduct."

if Technologies' corporate veil is pierceable can the courts next proceed to pierce Inter–Tel's corporate veil. They offer no authority for this sequential piercing argument and neither the Court of Appeals nor this Court has found such. There is, however, authority for piercing the veil of any related entity where the facts justify it. *See, e.g., Bhd. of Locomotive Eng'rs v. Springfield Terminal Ry. Co.*, 210 F.3d 18, 29 (1st Cir.2000) (veil piercing is not limited to the parent corporation but may include other entities "in the same corporate family"); *United Rubber, Cork, Linoleum and Plastic Workers of Am., AFL–CIO v. Great Am. Indus., Inc.*, 479 F.Supp. 216 (S.D.N.Y.1979) (piercing veils of parent and grandparent); *In re Moll Industries, Inc.*, 454 B.R. 574, 587 (Bankr.D.Del.2011) ("It is not necessary for the [Appellant] to make allegations sufficient to pierce every layer of the corporate structure between [the subsidiary] and [the grandparent corporation].").

■ In any event, where the parent is the wholly-owned subsidiary of the grandparent; the grandparent has provided 100% of the funds for the parent's purchase of the subsidiary; the parent itself has failed to follow corporate formalities; the grandparent pays the subsidiary's employees; the grandparent acts interchangeably with the parent in filing tax returns regarding what is supposedly the subsidiary's business; and the officers of the subsidiary and parent are also officers of the grandparent it is apparent that little, if any, effort has been exerted in maintaining separate corporate identities. The situation in this case was so confused that the General Counsel of Inter–Tel actually described the Kentucky operations at Linn Station Road (which customers most likely thought were ITS operations) as both a branch office of Technologies *and* a branch office of Inter–Tel. The equitable doctrine

of veil piercing cannot be thwarted by having two entities, rather than one, dominate the subsidiary and dividing the conduct between the two so that each can point the finger to some extent at the other. Technologies was 100% owned and controlled by Inter–Tel and the two corporations acted completely in concert in dominating ITS and extracting anything of value from ITS. It is entirely appropriate for this Court to look at the larger picture of the conduct of Inter–Tel and Technologies as opposed to only the individual actions of the parent entity. To do otherwise would render the equitable piercing doctrine hopelessly inadequate, if not meaningless in some cases, based on the sheer number of business entities involved. Where such entities have acted in concert without regard to their own corporate separateness to achieve the unjust results that veil piercing protects against, any insistence on sequential piercing necessarily falls on deaf ears.

Turning to the facts, ITS was clearly not only influenced by Technologies/Inter–Tel but there was such unity of ownership and interest that ITS's separate identity had ceased. Marching down the list of factors identified by Powell, all of ITS's stock was owned by Technologies (which in turn is 100% owned by Inter–Tel), and from 1999 through 2002 ITS had the same directors as Technologies and every ITS and Technologies director was also an officer of Inter–Tel. In that same period, all of ITS's officers were officers of both Technologies and Inter–Tel. Technologies and Inter–Tel financed ITS because ITS had no assets or bank accounts of its own, with all revenues going to an account controlled exclusively by Inter–Tel. Thus the first three factors are unquestionably met. The fourth factor relates to the parent subscribing to all of the capital stock or causing the incorporation of the subsidiary, something that did not occur here because ITS was an independent business that op-

erated for years before being purchased by the Inter–Tel group in 1998.

■ ITS had grossly inadequate capital for day-to-day operations because it had no funds at all, literally nothing of its own. The adequate capital factor, which obviously corresponds to the undercapitalization factor identified in *White*, deserves some comment. Blumberg concisely explains how this factor should be viewed:

> As the Supreme Court made plain in *Anderson v. Abbott*, 321 U.S. 349, 361–66 [64 S.Ct. 531, 88 L.Ed. 793] (1944), consideration of the adequacy of capitalization concerns the initial financing of the corporation, not its condition at the time of the events complained of or thereafter. Subsequent economic developments that weaken the debtor's financial condition, even those leading to insolvency, are irrelevant for this purpose if the corporation was adequately financed at the outset. There are two exceptions. *When the inadequacy of capitalization arises after commencement of the business, as a result of capital transfers to the controlling shareholder, it may be taken into account; the withdrawal renders the initial adequacy irrelevant.* Similarly, when the corporation substantially expands its size or the nature of its business, its capital requirements change, and there may be undercapitalization of the new business despite any additional infusion of capital.

Blumberg, *supra*, § 14.04[B] (footnotes and citations omitted) (emphasis added). The transfers of any and all operating capital that ITS previously possessed to Inter–Tel resulted in an undercapitalization at the times relevant to this litigation, regardless of the initial capitalization when ITS was independently incorporated years before the Inter–Tel group purchased it.

Inter–Tel paid the employees' salaries and other expenses of ITS. ITS had no assets of its own, only those it was allowed to use by Technologies or Inter–Tel.[8] ITS simply had no independent financial existence. ITS's operations in Kentucky were described on Inter–Tel's internet site (the modern day equivalent of the "papers or statements" referred to by Powell) as Inter–Tel's sales and service locations. Both Technologies and Inter–Tel used the Linn Station lease premises and any other assets previously held by ITS solely for the benefit of Inter–Tel, not for ITS's benefit. Certainly the ITS officers and directors failed to act in that corporation's best interest because they allowed it to be stripped of its income and assets by Technologies and Inter–Tel, acting in the interest of Inter–Tel to the detriment of any other entity. Finally, the formal legal requirements of ITS were not observed. There were no shareholder or director meetings in 1999, 2000, 2001 and 2002 and the proffered unanimous consent waivers of those meetings are unsigned. In sum, every single factor identified by Powell as bearing on lack of corporate separateness, save one, is present here. As outlined in the first element of the alter ego test, there was such unity of ownership and interest that ITS's separateness from Technologies and Inter–Tel ceased to exist.

■ As for the second part of the alter ego test, there is plainly more here than simply domination of a corporation by its parent/grandparent and a creditor left holding an uncollectible debt: there is the required "injustice." The *Sea–Land* Court referred to one unjust situation as a parent corporation causing a subsidiary's liability and then rendering the subsidiary unable

---

8. General Counsel for Inter–Tel and Technologies maintained that the books showed ITS with some assets but only "for tax purposes, not for operating purposes." This equates to no assets.

to pay the liability. 941 F.2d at 524. On these facts, it is apparent that Inter–Tel and Technologies caused ITS to accrue monthly rent liability under the Linn Station lease while they derived all of the benefits from the operation of the business at that premises. The leased premises never benefited ITS, which had no independent financial existence, only Inter–Tel and Technologies, and those entities were the very ones that rendered ITS incapable of ever meeting the lease payments. A second scenario identified by the *Sea–Land* Court as sufficient to satisfy the promoting injustice factor is "an intentional scheme to squirrel assets into liability-free corporations while heaping liabilities upon an asset-free corporation." *Id.* This scenario also applies because, pursuant to the contract, the lease liability fell solely on ITS yet all of its assets were "squirreled" into Inter–Tel beyond a legitimate creditor's reach absent application of the piercing doctrine.[9]

■ Courts should not pierce corporate veils lightly but neither should they hesitate in those cases where the circumstances are extreme enough to justify disregard of an allegedly separate corporate entity. This case is clearly within the boundaries of proper application of the equitable doctrine and thus we conclude that the trial court and Court of Appeals did not err in piercing ITS's veil to hold Inter–Tel and Technologies responsible for ITS's debt to Linn Station.

## II. Linn Station Has Not Forfeited the Right to Seek the Equitable Remedy of Veil–Piercing

■ Technologies and Inter–Tel insist that Linn Station has no right to invoke

equity because it knowingly accepted lease payments from Inter–Tel and then failed to join Inter–Tel and Technologies in the first action to collect the debt. Beginning with the second point, there is nothing inappropriate about proceeding first to secure a judgment as to the actual debtor and, upon determining that the debtor has no assets and its corporate shield may be vulnerable, then bringing a piercing suit against those who actually control the corporation and have rendered it judgment-proof. *Sea–Land* is but one of many examples of piercing litigation that followed earlier debt collection litigation against the actual debtor. 941 F.2d at 519. *See also Bodenhamer Bldg. Corp. v. Architectural Research Corp.,* 873 F.2d 109 (6th Cir. 1989) (applying Michigan law); *Wm. Passalacqua Builders, Inc.,* 933 F.2d at 131; *Durrant v. Quality First Mktg., Inc.,* 127 Idaho 558, 903 P.2d 147 (Idaho Ct.App. 1995); *Davenport v. Quinn,* 53 Conn.App. 282, 730 A.2d 1184 (1999). In *Sea–Land,* as here, a default judgment was secured against the debtor, Pepper Source (PS), which had no assets. As the Seventh Circuit succinctly described the sequence of events: "Worse yet for Sea–Land ... PS apparently had no assets. With the well empty, Sea–Land could not recover its judgment against PS. Hence the instant lawsuit." 941 F.2d at 520. *See also Miner v. Fashion Enters., Inc.,* 342 Ill.App.3d 405, 276 Ill.Dec. 652, 794 N.E.2d 902, 911 (2003) ("[J]udgment creditor could use supplementary proceedings to discover whether the judgment debtor corporation's individual shareholders and directors held assets of the corporation, or the judgment

---

9. Notably, to the extent there were ITS assets on the books "for tax purposes," Technologies recorded a security interest in them. So while there really were no ITS assets, if Inter–Tel's tax accounting measures somehow gave support to the idea that there were assets in ITS, that "base" was covered by Inter–Tel causing Technologies to file a superior security interest.

creditor could choose to file a new action to pierce the corporate veil in order to hold the individual shareholders and directors personally liable for the judgment of the corporation."). There is no valid basis for precluding a piercing action simply because the claim was not part of the original debt collection suit.[10] In some cases, the creditor may know enough to proceed against all potentially liable parties but, in other instances, it may be appropriate to obtain the judgment first and only when it proves uncollectible then seek relief through veil-piercing litigation.[11]

Inter–Tel and Technologies also complain that Linn Station accepted rent checks from Inter–Tel and could have or should have sought guarantees or an assignment of the lease to Technologies and/or Inter–Tel. In essence, they are arguing that Linn Station should have investigated ITS and the circumstances at the leased premises and sought to protect itself from the inevitable. This argument seems to equate to "they should have known what we were doing." As for the rent checks, the mere fact that the grand-parent corporation pays the monthly rent does not put the lessor on notice that the lessee-subsidiary has become an asset-less, income-less shell. As to guarantees and assignments, the Court of Appeals is correct in assessing the facts and conclud-

ing that any attempt to obtain those would have been futile. While Inter–Tel and Technologies insist there is no basis in the record for this conclusion, there is credible support. In a May 21, 2002 letter the General Counsel for Inter–Tel and Technologies invited a default judgment against ITS noting that Technologies had never guaranteed the lease and that they would not pay the judgment. Given that statement and the care with which Inter–Tel and Technologies relieved ITS of all assets while leaving it with this liability, it is disingenuous to claim that Linn Station's predicament could have been avoided by a simple request for a guarantee by Inter–Tel or an assignment of the lease to it or Technologies. In any event, Linn Station as lessor was not required to chase guarantees from, or assignments to, other entities in the carefully-constructed and managed Inter–Tel group before seeking equitable relief to hold them responsible for their actions.

### III. The Default Judgment Is Enforceable Against Inter–Tel and Technologies

■ Finally, Inter–Tel and Technologies insist the default judgment against ITS cannot be enforced against them because they were "not before the court" when the judgment was entered.[12] In sup-

---

**10.** Indeed, the Kentucky Court of Appeals recently recognized the propriety of raising a piercing claim in a supplementary proceeding, pursuant to Civil Rule 15.04. *Williams v. Oates*, 340 S.W.3d 84, 87 (Ky.App.2010) ("We reject Appellees' argument that [Appellant] was barred from setting forth a claim for "piercing the corporate veil" in any subsequent execution proceedings because such a claim was not pleaded in the original complaint.").

**11.** Indeed, the creditor may not have sufficient information at the time of the initial debt collection suit to file a piercing claim that is "well grounded in fact" as required by

Civil Rule 11. In these circumstances, a second suit or a supplementary pleading would be absolutely necessary.

**12.** This argument is closely connected, obviously, to the preceding argument regarding the necessity of raising veil-piercing in the initial debt collection action. As we have noted, that is procedurally unnecessary. Moreover, once a second suit establishes proper grounds for piercing the corporate veil the substantive law that justifies that equitable result further establishes the propriety of enforcing the judgment in the initial action, default or otherwise, against the dominating shareholders.

port they cite Kentucky cases where property was sold pursuant to a judgment entered in litigation where not all parties having an interest in the property were before the court, *Proctor v. Mitchell,* 302 Ky. 179, 194 S.W.2d 177 (1946); *Brewer v. Burch,* 306 Ky. 339, 207 S.W.2d 562 (1947). These cases have no bearing on the equitable piercing litigation before us. Moreover, Inter–Tel and Technologies cited these same cases to the Court of Appeals when this case went before that court in 2008 on an appeal from an order vacating a prior order compelling arbitration. At Inter–Tel and Technologies' request, the Court of Appeals addressed the very issue which they now raise again:

> Finally, Technologies and Inter–Tel argue that the default judgment entered against ITS is void as it relates to them because they were not parties to the 2002 action. Again, however, Technologies and Inter–Tel miss the point. As Linn Station points out, it is not trying to enforce the default judgment on the grounds that Technologies and Inter–Tel are debtors in that judgment. Rather, it is seeking to impose liability by piercing the corporate veil of ITS. Linn Station has maintained that it is entitled to equitable relief based upon the dealings of ITS's parent companies which rendered it defunct and unable to satisfy its obligations.

*Inter–Tel, Inc. v. Linn Station Properties, LLC,* 2007–CA–001185–MR, 2008 WL 2065858 (Ky.App. May 16, 2008) (internal citations omitted). The Court of Appeals recognized that the default judgment could be enforced against Technologies and Inter–Tel if Linn Station could succeed in veil-piercing. So, there is definitely merit to Linn Station's argument that the earlier Court of Appeals ruling is now the law of the case. *See Inman v. Inman,* 648 S.W.2d 847, 849 (Ky.1982).

The better rationale for concluding Inter–Tel and Technologies are responsible for the default judgment is purely substantive. Linn Station has now succeeded in piercing ITS's corporate veil and for all intents and purposes Inter–Tel and Technologies were before the court in the debt collection case. They were simply there in the guise of ITS. ITS was controlled completely by Technologies and Inter–Tel and the General Counsel for the latter two entities specifically disavowed any responsibility for the Linn Station lease obligation, expressly inviting Linn Station to seek a default judgment against ITS— which it did. Now that Linn Station has the default judgment in hand, Inter–Tel and Technologies complain about their absence before the court in the debt collection case. This is indeed a bit like the defendant who, having killed his parents, throws himself on the court's mercy because he is an orphan. Having disavowed interest in the lease matter and invited a default judgment against the defunct ITS, Inter–Tel and Technologies now want to set aside the default judgment and start over on the merits of Linn Station's claim. There is no "do over" in these circumstances. ITS's veil has been pierced and the default judgment is enforceable against Inter–Tel and Technologies.

## CONCLUSION

Inter–Tel and Technologies, together, exercised complete control and dominion over ITS, causing it to lose any semblance of separate corporate existence. As ITS's parent and grandparent, Technologies and Inter–Tel transferred all of ITS's income and assets to themselves, thus deriving all of the benefits from the business conducted at the Linn Station Road premises while leaving behind a shell entity from which a legitimate creditor could recover nothing. Under these circumstances there was the requisite domination and injustice

to justify piercing ITS's corporate veil to hold both Technologies and Inter–Tel responsible for the default judgment previously obtained by Linn Station against ITS. Accordingly, the Court of Appeals opinion is affirmed and this matter is remanded to the trial court for entry of a Judgment against Inter–Tel and Technologies consistent with that court's November 12, 2008 Order.

All sitting. All concur.