Tom G. DINGUS and James
D. Adams, Appellants,

v.

FADA SERVICE CO., INC.; H.C.M.C.,
Inc.; Pikeville Investors, Inc.; P & P
Investors, Inc.; Holiday Inn, Inc.;
Prestonsburg Investors, Inc.; Paints-
ville Investors, Inc.; H.D. Fitzpatrick,
Jr.; Jack Absher; and Middleton &
Reutlinger, Appellees.

No. 91–CA–3052–MR.

Court of Appeals of Kentucky.

June 11, 1993.

Shelby C. Kinkead, Jr., Bulleit, Kinkead, Irvin & Reinhardt, Lexington, Eugene C. Rice, Rice, Preston & Brown, Paintsville, for appellants.

Richard E. Fitzpatrick, Gess, Mattingly & Atchison, Lexington, Clifford B. Latta, Prestonsburg, for appellees, Fitzpatrick and Absher.

Brooks Alexander, James R. Higgins, Vonnell C. Tingle, Julie Ann Gregory, Middleton & Reutlinger, Louisville, Ralph H. Stevens, Combs & Stevens, Prestonsburg, James G. LeMaster, Greenebaum, Doll & McDonald, Lexington, for appellees.

Before DYCHE, McDONALD and WILHOIT, JJ.

McDONALD, Judge.

This appeal involves questions of deadlocked shareholders' voting, shareholders' pre-emptive rights, ultra vires acts, corporate custom, directors/shareholders' estoppel and ratification, all pursued in an action for judicial dissolution under KRS 271B.14–300(2).

Paintsville Investors, Inc. (Paintsville) was formed for the purpose of constructing and operating a nursing home under the corporate umbrella, FADA Service Co. (FADA), a holding company.

FADA, as the parent company of Paintsville and the other appellee corporations, operates nursing homes in eastern Kentucky, along with a Holiday Inn in Prestonsburg. For a glimpse at the scope of its corporate business, FADA's corporate revenues amounted to about 8.5 million dollars a year, with nearly 300 active employees and a $300,000 monthly payroll. The nursing home operations care for about 280 patients, with 225 employees, and the Holiday Inn employs 70 people servicing 2500 guests each month. FADA's ownership and the ownership of its subsidiaries are represented by four shareholders, each with 25% of the stock. The shareholders are Tom G. Dingus and Dr. James D. Adams, the plaintiffs in the trial court and appellants on appeal, and H.D. Fitzpatrick, Jr. and Jack Absher, who with the named corporations and their counsel, Middleton & Reutlinger, were the defendants in the trial court and the appellees herein.

A history of the corporations shows quite a successful operation. After almost 20 years of entrepreneurial achievement, corporate philosophical differences surfaced among the shareholders.[1] Dingus and Adams were nearing retirement age. They wanted to ultimately withdraw from active operation of the corporations, while Fitzpatrick and Absher desired to expand their operations.

Over the years, with Fitzpatrick as president and the most assertive of the shareholders, the shareholders would meet every Tuesday and handle corporate affairs. Connie Sammons, the business office manager, handled the supervision of corporate affairs and day-to-day corporate operations. She also attended the Tuesday meetings with the shareholders.

Paintsville was incorporated in 1987 for the purpose of obtaining a certificate of need for a nursing home facility in Johnson County. The first filed certificate of need application was denied because the state had a ban or moratorium on the development of such facilities in the state. After the application's denial, Paintsville remained dormant.

The historical practice of these shareholders, directors, and officers was that when a corporate debt was incurred Mrs. Sammons would make a monetary call and each shareholder contributed an equal sum. This procedure was done until each of the corporations was able to generate a profit on its own. After the contributions reached a sum of $500 by each shareholder, stock in the corporations was issued. No formal minutes were kept concerning the Tuesday meetings, no motions were made, and no formal voting was recorded. It is undisputed that the corporation by-laws were offended by issuing the corporate stock in such manner, but it was the manner in which the business was conducted from its inception.

In November, 1990, Connie Sammons informed the shareholders that Fitzpatrick wanted to go forward with a new application for a certificate of need for Paintsville. The state had lifted the ban on nursing homes, and it was quite possible that the

---

1. The shareholders were not only equal owners, but were also the directors and officers of the appellee corporations.

new application would be approved with adequate demonstration of the need for such facility in Johnson County. Mrs. Sammons initially informed the shareholders that there were sufficient funds in the corporation to complete the application. Subsequently, Mrs. Sammons advised that more money was needed for the new application and for the purchase of an option on the property necessary for the facility. The amount of $2100 was needed for the option, and the Paintsville corporate account was already overdrawn $871 for the payment of necessary corporate expenses. The call was for $1250 from each shareholder.

Initially, Dingus and Adams were reluctant to be part of the Paintsville application renewal and, with the request for additional money, Dingus and Adams balked.

Finally, Dingus and Adams agreed to renew the application for the Paintsville project. Prior to the meeting on November 20, 1990, Mrs. Sammons informed the shareholders, at Fitzpatrick's direction, that a contribution of $2500 would be requested from each. This sum, according to Dingus and Adams, was five times greater than the amount needed for the application renewal. Dingus and Adams made their feelings known and Fitzpatrick was so informed. The minutes of the November 20, 1990 meeting do not reflect these circumstances, but testimony has reconstructed it. Revealing is the fact that on November 20, 1990, after Fitzpatrick and Absher made their individual contributions, Dingus and Adams signed checks for the property option, knowing full well that previously there were no funds to make such payment.

A special meeting of the shareholders was formally called by Mrs. Sammons for January 30, 1991, requested by Dingus and Adams. The corporate minutes reflect the following: (1) that each shareholder owned 14 shares; [2] (2) that Fitzpatrick and Absher had five shares each of *unissued* stock because of their $2500 contributions in response to the previous monetary call; (3) that demand was made on Dingus and Adams to contribute $2500 each for five additional shares; (4) Dingus and Adams refused any additional contributions; and (5) Dingus and Adams offered to be bought out for $7000 each, the amount they had previously contributed to the corporation.

On March 18, 1991, five additional shares were issued and registered to Fitzpatrick and Absher. This stock issuance broke the deadlock between the warring factions which triggered the filing for dissolution of the corporation in the circuit court. After the conclusion of the trial, the circuit court made findings of fact, summarized and paraphrased as follows:

1) Paintsville's business affairs were tightly but informally managed, as the same shareholders, directors and officers did for the holding company and its other subsidiaries since 1965. A custom for doing business was established which included the method of issuing stock, albeit in violation of its own by-laws, and therefore, by inference, a technical violation of KRS 271B.6–211.

2) It was customary that when a legitimate corporate debt arose, current or anticipated, with insufficient funds to cover it, an informal call for equal contributions was made to cover the debt. The calls were made by telephone requests or at the regular Tuesday meetings.

3) Once the contributions amounted to $500, a share of stock was issued. Shareholders were not obligated to make additional contributions.

4) Dingus and Adams knew that Fitzpatrick and Absher contributed $2500 each for additional Paintsville debt coverage. They were asked to contribute but refused. They did not object to the minutes of the March 18, 1991 meeting verifying these matters nor did they object to Fitzpatrick and Absher receiving five additional unissued shares of stock. No corrections of the corporate minutes were ever offered.

5) The value of Paintsville was found to be $75,000, based on sums spent in planning, legal costs for certificate of need,

2. The articles of incorporation authorized 2000 shares of no par common stock.

property option and the cost of proof of value.

6) The proof of value by the Cardinal Group of $250,000 as the value of Paintsville was rejected and excluded by the circuit court.

The first issue on appeal is that the "issuance" of the five shares of Paintsville investors' stock to Fitzpatrick and to Absher on March 18, 1991, was ultra vires and without effect.

Dingus and Adams argue that to comply with KRS 271B.6–210 and § 7(e) of the corporate by-laws,[3] there had to be a call for monetary contribution, a second to the call, an affirmative vote and then a resolution prior to the corporation issuing stock. Fitzpatrick and Absher assert that, as it was understood by all, if any shareholder did not want to answer a call, he could walk away from it and keep his status quo in the corporation by retaining the number of shares he owned. Those who wanted to go forward with the opportunity to acquire more shares would answer the call and make a contribution. This method of corporate financing was not only a tacit understanding among the shareholders; it was, in fact, the only method in which stock issuances were made, and the issuance in question was not ultra vires.

Professor Harry G. Henn in his hornbook *Law of Corporations*, 3d Edition (1983), § 184, explains:

> The approach to ultra vires acts [ultra vires acts are sometimes confused with illegal acts, or with acts within the power of the corporation but exercised either by the improper corporate organ or by the proper corporate organ without complying with the required procedures] has undergone a drastic change over the years. As a result the Ultra Vires Doctrine is no longer as important as it once was.
>
> In times past, corporations were formed with more limited purposes (or objects) and powers, and these more strictly construed. By the traditional

theories, a corporation was deemed to be an artificial entity created by the state with limited capacity. Any corporate act beyond such capacity was deemed ultra vires, void, illegal, and a nullity.

. . . .

By the more modern approach, an ultra vires act if not a public wrong is not illegal. The question is not one of "capacity" but of powers.

In his treatise on Corporations found in *Kentucky Jurisprudence,* Revised Volume, 1992, William S. Haynes instructs that the doctrine of ultra vires has lost its favor with courts. Clear distinction must be made between conduct which is illegal, tainted by fraud, prohibited by statute and contrary to public policy; and conduct alleged to be ultra vires or beyond the expressed or implied powers of a corporation. The enactment of KRS 271B.3–040 under the *Kentucky Business Corporation Act,* effective 1989, greatly limited the ultra vires doctrine. It states, with four exceptions, which we conclude are not applicable, that:

> (1) . . . [T]he validity of corporate action shall not be challenged on the ground that the corporation lacks or lacked power to act.

While the claims of ultra vires acts are curtailed, it remains that the statute is accommodated by equitable proceedings. The mentality of the present law is when the corporation benefits from acts, absent fraud, self dealing and illegality, the doctrine of ultra vires is not readily available for application.

Herein, the directors/shareholders failed to comply with the corporate by-laws in that the stock issuance of March 18, 1991, was not by resolution. However, such, in our opinion, was not an illegal or fraudulent act. Certainly, the corporation was empowered to issue 10 additional shares because its articles authorized 2000 shares with only 56 shares issued as of March 18. Professor Henn's previously cited instruc-

---

**3.** "Section 7. Secretary. The Secretary shall: . . . (e) sign with the President, certificates for shares of the corporation, the issuance of which shall have been authorized by *resolution* of the Board of Directors; . . ." (emphasis added).

tion is apropos in stating, "The question is not one of 'capacity' but of powers."

Regardless, there was ample time for Dingus and Adams to petition for injunctive relief to enjoin the issuance of the stock. It was on November 20, 1990, that Dingus and Adams knew Fitzpatrick and Absher contributed $2500 each. It was on January 30, 1991, that Dingus and Adams knew Fitzpatrick and Absher claimed five shares of additional but unissued stock. It was March 18, 1991, when the stock was actually issued and registered. Dingus and Adams did not object or move to prevent the issuing of the stock and its registration.

A close look at the actions taken makes it obvious the corporation benefited. The moneys contributed were for the payment of legitimate corporate debts and anticipated expenses. The securing of the certificate of need was in the furtherance of the corporation's purpose and business interest. Potentially, the certificate will be a corporate asset far beyond the value of the shareholders' individual contributions.

■ The stock issuance of March 18, 1991, the trial court found, was a de jure issuance because it was done in the same manner as all of the prior issuances. This corporate behavior established a custom. It was also the usual past practice of not only Paintsville, but of FADA and the other subsidiaries. The trial court's findings rested on inferred facts from the record, which have the same dignity as evidentiary facts. Unless clearly erroneous, we cannot disturb them on appeal. CR 52.01.

■ However, we detect a serious flaw in the trial court's analysis. The trial court did not take into consideration that all of the prior stock issuances were accomplished by some type of majority board/shareholder agreement or acquiescence, notwithstanding the fact that a resolution was lacking. In the instance before us, the directors/shareholders were deadlocked. Being deadlocked, the action taken cannot fall within the scope of corporate custom, and the findings and conclusions of the trial court to this effect are clearly erroneous. The trial court's declaration of corporate custom is reversed.

■ The argument of Dingus and Adams that the money contributed after the call was a loan by Fitzpatrick and Absher to the corporation is baseless in fact. It was never the experience of Paintsville that its directors/shareholders made loans to it. It was never the experience of any of the corporations that such a method of corporate financing was utilized. Contending that these contributions were loans is fantasy. Stock was always issued after the shareholders advanced or contributed money for corporate debts.

We are persuaded that principles of estoppel and ratification will prevent Dingus and Adams from challenging the stock issue. In this regard, we affirm the trial court.

A good lesson is taught from an old case. That lesson is found in *Elk Valley Coal Co. v. Thompson*, 150 Ky. 614, 150 S.W. 817, 822 (1912):

> Where the unauthorized act is beneficial to the corporation, and the directors have individual knowledge of it, slight evidence will be sufficient to establish ratification by acquiescence or failure to repudiate, and this upon the theory that a party who accepts benefits will be deemed to have done so with a knowledge of the conditions and circumstances surrounding the transaction out of which the act creating the benefit arose, and must take the burdens with the benefits.

Appellants Dingus and Adams rely on *Roach v. Bynum*, Ala., 437 So.2d 69 (1983), where an owner of a closely held corporation, *without notice*, issued himself an additional 500 shares of stock after it was clear he was losing control of the corporation. The Alabama Supreme Court declared the issuance void. The facts in *Roach* do not come close to our facts; therefore, the precedential value of the case is immaterial to us.

■ Herein, Dingus and Adams agreed reluctantly to be part of the renewal of the application and then refused to contribute any money for legitimate expenses. Din-

gus and Adams sat back and witnessed Fitzpatrick and Absher make up their part of the expenses by additional contributions. They knew Fitzpatrick and Absher contributed with the anticipation of receiving additional shares. The facts are substantial to support the trial court's finding of Dingus and Adams' waiver of their preemptive rights to equal ownership, and the findings of estoppel and ratification by acquiescence.

We affirm the trial court in adjudging that Fitzpatrick and Absher are the legal owners of five additional shares each of the authorized shares of Paintsville. The issue over the fair market value of the certificate of need is now moot and we will not address it.

The last issue is that the trial court erred by failing to remove Middleton & Reutlinger as counsel for the corporate defendants and in approving payment of their fees.

Dingus and Adams claim that the law firm, Middleton & Reutlinger, which serviced Paintsville, and the other corporations, took sides in the dispute and militantly advanced the interests of Fitzpatrick and Absher. They also assert that the law firm charged too much in fees for services performed.

When this litigation was filed, in its early injunctive stages, the trial court charged Middleton & Reutlinger, as corporate counsel, to take care of the corporations and preserve the assets. We conclude Middleton & Reutlinger did nothing in handling the corporate affairs inconsistent with the sensible admonitions of the trial court.

The corporations were represented by Middleton & Reutlinger; Dingus and Adams had separate counsel as did Fitzpatrick and Absher. It would have been foolhardy to have the corporations represented by strangers.

Dingus and Adams cite *In re Dissolution of Clemente Bros., Inc.*, 239 N.Y.S.2d 703, 19 A.D.2d 568 (1963), for the proposition that in a dissolution proceeding the corporation, through its counsel, could not militantly align itself on one side of the dispute which was antagonistic to the other side. The *Clemente Bros., Inc.* opinion is not very enlightening, but it does hint that militant alignment on the side of one of two equal, discordant stockholders is unwarranted.

In our review of Middleton & Reutlinger's performance, we see not the taking of one side or the other, but the taking of a stance for preserving and defending the corporations under the entrustment orders of the trial court. We affirm the trial court in this regard.

 The dispute over the amount of the fees is a matter within the sound discretion of the trial court. Reasonableness of an attorney fee must encompass the time involved, the task assigned, and the degree of difficulty of the work under the circumstances. Reasonableness of attorney's fee is for the trial court to determine, subject only to the abuse of discretion. *Cf. Woodall v. Grange Mutual Casualty Co.*, Ky., 648 S.W.2d 871 (1983). There was no abuse of discretion in this matter.

In conclusion, the judgment of the Floyd Circuit Court is affirmed in part and reversed in part, and the case is remanded for the circuit court to dismiss the action by Dingus and Adams to dissolve Paintsville Investors, Inc.

All concur.