RENDERED: JULY 29, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-0117-MR

SPA RENTALS, LLC; KATHLEEN A.
IVERSEN; AND WALTER P.
IVERSEN                                                                APPELLANTS


APPEAL FROM PULASKI CIRCUIT COURT
v.        HONORABLE TERESA KAY WHITAKER, JUDGE
ACTION NO. 19-CI-00379


SOMERSET-PULASKI COUNTY
AIRPORT BOARD                                                         APPELLEE

AND


NO. 2021-CA-0152-MR

SOMERSET-PULASKI COUNTY
AIRPORT BOARD                                                   CROSS-APPELLANT


CROSS-APPEAL FROM PULASKI CIRCUIT COURT
v.        HONORABLE TERESA KAY WHITAKER, JUDGE
ACTION NO. 19-CI-00379

SPA RENTALS, LLC; KATHLEEN A.
IVERSEN; AND WALTER P.
IVERSEN                                          CROSS-APPELLEES


<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  CALDWELL, MCNEILL, AND TAYLOR, JUDGES.

CALDWELL, JUDGE:  SPA Rentals, LLC (hereinafter "SPA") and Kathleen and

Walter Iversen (hereinafter "Iversen") appeal from the Pulaski Circuit Court order

granting summary judgment in favor of the Somersert-Pulaski County Airport

Board (hereinafter the "Board"), and a later order granting attorney's fees to the

Board.  The Board cross-appeals.  Having reviewed the proceedings below, the

briefs of the parties and the applicable law, we affirm.

## RELEVANT FACTS AND PROCEDURE

The Board operates the Lake Cumberland Regional Airport located in

Somerset, Kentucky.  SPA is a foreign limited liability company organized in Ohio

and is now engaged in the business of rehabilitating and selling aircraft, but

performed maintenance services for customers of the airport at the time the

contractual arrangement commenced between it and the Board.  Walter Iversen is

the sole member of SPA.

In 2009, the Board and SPA executed two year-long lease agreements wherein each of which SPA leased two hangars.[1] The parties also executed a LFBO.[2] The leases were renewable on a yearly basis unless one of the parties tendered written notice of the intention not to renew. The leases provided for the Board to collect any expenses related to the collection of any monies due under the leases, including reasonable attorney's fees, but did not provide for any prejudgment interest. The operator agreement stated that renewal of the contract would not be "arbitrarily denied" if all of the "required qualifications" were met.

The leases renewed on a yearly basis until 2012, when the Board sent SPA a letter announcing its intention not to renew the leases or the operator agreement at their expiration at the end of the year. The Board had determined that the airport needed to lease the hangars to an entity which would provide maintenance services to patrons of the airport. Since the first agreements had been entered, SPA had ceased providing such services and had transitioned to

---

[1] The rental amount for Hangar B-3 was $400 per month and for Hangar B-4 was $600. The limited fixed-base operator ("LFBO") fee was an additional $100 a month, so the total that SPA owed the Board each month was $1,100.

[2] "A fixed-base operator fuels, services, and hangars airplanes in much the same way that a service station provides similar services for automobiles. *American Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 328 (8th Cir. 1996); *City of Pompano Beach v. F.A.A.*, 774 F.2d 1529, 1533 n.5 (11th Cir. 1985)." *Abou-Sakher v. Humphreys Cty.*, 955 S.W.2d 65, 67 n.1 (Tenn. Ct. App. 1997).

purchasing and refurbishing airplanes for sale in the hangars it had leased.[3]  The

Board also sent some lease modifications, should SPA want to execute new lease

contracts with the new terms.  The parties could not come to an accord on the

modifications, and on January 1, 2013, SPA became a holdover tenant at the

expiration of the last lease term.

In March of 2013, SPA filed a formal complaint with the Federal

Aviation Administration ("FAA") alleging the Board had discriminated against

SPA by offering the operator agreement and the hangars to another entity.  During

the pendency of the litigation, SPA unilaterally reduced the amount of monthly

rent it paid after the expiration of the leases and agreement to a total of only $500 a

month – less than half what it had paid under the lease and the operator agreement.

The Board did not acknowledge the validity of the lesser amount but did accept the

monthly tender.

---

[3]    At the end of 2011, the Board notified SPA of its intent to let SPA's lease and LFBO agreements expire.  The Board also determined that there was an unmet need for maintenance services at the Airport, so it solicited bids from third-party maintenance service providers.  SPA did not bid, but two bidders emerged.  These bidders demanded certain incentives should the Board decide to engage their services.  The Board picked Somerset, executing a lease and an LFBO agreement with it on March 24, 2012.  Under those agreements, the Board agreed to pay up to $8,000 of the cost of Somerset's public liability insurance, forgo receiving rent payments, and charge only a $1 LFBO fee.

*SPA Rental, LLC v. Somerset-Pulaski Cty. Airport Bd.*, 884 F.3d 600, 602 (6th Cir. 2018).

-4-

The FAA ruled in favor of the Board and the Sixth Circuit affirmed that ruling in March of 2018. *Id.* At the conclusion of the litigation begun by SPA, and after a stay imposed by a court handling the Iversens' bankruptcy petition was lifted, the Board sent SPA a letter requesting they vacate the hangars within sixty (60) days and pay all past due rent. SPA did not vacate or remit any funds to the Board, so the Board met and authorized the Airport Manager to seek recovery of possession of the hangars. A forcible detainer action was filed in Pulaski District Court, naming both SPA and Mr. Iversen[4] in June of 2018.

When no decision was ever entered by the district court, another forcible detainer action was filed by the Board in January of 2019. The parties negotiated an agreed judgment wherein SPA would vacate the hangars by February 25, 2019. SPA did vacate the hangars on or before February 25, 2019.

The Board met again and determined to begin legal proceedings to recover past due rents and costs, including attorney's fees. The underlying matter was filed.

In February of 2020, the Pulaski Circuit Court granted summary judgment in favor of the Board and awarded $50,695.65, representing past due rent in the amount of $40,400 and 8% interest in the amount of $10,295.65, to be set off

---

[4] All rental payments, whether under the lease or during the holdover term, had always been paid from Mr. and Mrs. Iversen's personal checking account.

by $1,318.26 that SPA had paid in maintenance costs during the holdover term where such maintenance should have been provided by the Board. Additionally, the court found that the corporate veil should be pierced, and Mr. Iversen found personally liable on the judgment, but specifically found Mrs. Iversen should not be liable.[5] Finally, the court granted the Board "reasonable attorney's fees" to be determined separately.

In December of 2020, another order was entered by the Pulaski Circuit Court addressing attorney's fees in favor of the Board in the amount of $26,200. This order incorporated the prior order and was made final and appealable. SPA and Iversen filed this appeal and the Board cross-appealed on the question of whether the trial court erred in not granting it attorney's fees appurtenant to the forcible detainer action because no bill of costs was timely filed during the forcible detainer litigation.[6] Having reviewed the record below, the briefs of the parties, and the applicable law, we affirm both orders.

---

[5] Neither party appeals the court's determination that Mrs. Iversen is not liable because she is not a member of the LLC.

[6] Kentucky Rules of Civil Procedure (hereinafter "CR") 54.04. *See Brett v. Media Gen. Operations, Inc.*, 326 S.W.3d 452, 460 (Ky. App. 2010).

## STANDARD OF REVIEW

When reviewing whether a trial court has properly considered a motion for summary judgment, the appellate court reviews the record *de novo* to ensure it supports the trial court's conclusion that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03.[7] "Because summary judgment does not require findings of fact but only an examination of the record to determine whether material issues of fact exist, we generally review the grant of summary judgment without deference to either the trial court's assessment of the record or its legal conclusions." *Hammons v. Hammons*, 327 S.W.3d 444, 448 (Ky. 2010) (citing *Malone v. Kentucky Farm Bureau Mut. Ins. Co.*, 287 S.W.3d 656, 658 (Ky. 2009)).

Whether and in what amount to grant attorney's fees to a litigant is a matter up to the discretion of the trial court and will be reviewed on appeal for an abuse of that discretion. *Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456, 465 (Ky. 2015).

## ANALYSIS

At the outset, we first address SPA and Iversen's contention that the Board had no authority to file the suit seeking damages for breach of the lease agreements. SPA and Iversen simply allege that the Board was not properly

---

[7] Kentucky Rule of Civil Procedure.

constituted so as to have the authority to vote to allow the manager to bring the suit, but wholly fail to provide any argument as to how the Board was infirm.

Rather, all citations to the record provided support the trial court's conclusion that the Board had a proper quorum when it voted in 2018 to authorize the manager to bring suit to recover possession of the hangars and any rents due from MSI, the name under which SPA was conducting business. Further, as cited by the trial court, in 2019 the Board authorized the manager to seek possession and monies due from the Iversens specifically.[8] Again, SPA and Iversen point to no particular infirmity which would call into question the legitimacy of the Board's actions. The trial court's determination that there was no issue of material fact to question that a properly constituted Board granted the management of the airport the authority to seek possession of the hangars and past due and owing rents is, therefore, affirmed.

SPA and Iversen do not contest that rent was owed to the Board for the hangars, they question only the amount of the rent the trial court assessed for the monthly rentals during the holdover term. Upon the expiration of the written lease and the onset of the litigation, SPA and Iversen unilaterally began paying an

---

[8] The monthly payments for rent and the operator's license had always been remitted from an account not in the name of the LLC, but a personal checking account in the name of Mr. and Mrs. Iversen. Such represents Mrs. Iversen's sole connection and reason for her inclusion as a defendant in the suit below.

amount less than half the rentals due under the lease. SPA and Iversen argue that the amount they paid was a proper amount, but give no explanation for why they had executed a lease for years prior which required them to pay twice that "proper amount." It is inconceivable that SPA and Iversen negotiated a lease for an improper amount when, based on that assertion, they apparently readily determined, after the expiry of the lease, a "proper amount."

The custom of the parties, as evidenced by the lease, is a reasonable calculus of the proper amount of the monthly rent for the hangars. Further, the act of the Board in accepting the reduced monthly payments during the holdover term did not act to establish a new proper amount of rent, as SPA and Iversen suggest. The amount of past rent awarded by the trial court is affirmed. *See Cass v. Home Tobacco Warehouse Co.*, 311 Ky. 95, 98-99, 223 S.W.2d 569, 571 (1949) ("Where the lease is thus renewed by holding over under this statute, it is presumed that the terms of the original lease are carried over into the extension provided by the statute.").

Mr. Iversen challenges the trial court's determination that SPA operated only as his alter ego, leading the court to determine that the corporate veil should be pierced and Iversen held personally liable for the amount of the

judgment.[9]  Generally, the members of a limited-liability company ("LLC") or those in leadership positions of a corporation are not liable for the amounts owed by the entity with which they are involved.  However, equity sometimes requires that a court find that the entity is but a hollow shell intended only to shield its principles from personal liability and not a separate entity.

> Piercing the corporate veil makes the corporation's debt "enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence."

*Tavadia v. Mitchell*, 564 S.W.3d 322, 328 (Ky. App. 2018) (citing *Inter-Tel Techs., Inc. v. Linn Station Properties, LLC*, *infra*).

> In Kentucky, there are three disparate avenues to piercing the veil.
>
> Kentucky jurisprudence recognizes three basic "theories" to "pierce the corporate veil" and hold the shareholders of a corporation responsible for corporate liabilities.  As described in *White v. Winchester Land Development Corp.*, 584 S.W.2d 56, 61 (Ky. App. 1979), the theories are "labeled (1) the instrumentality theory; (2) the alter ego theory; and (3) the equity formulation."

*Daniels v. CDB Bell, LLC*, 300 S.W.3d 204, 211-12 (Ky. App. 2009).  The doctrine is also applicable to LLCs.  *Turner v. Andrew,* 413 S.W.3d 272, 277 (Ky. 2013).

---

[9] The trial court determined Mrs. Iversen had no connection to SPA and was dismissed by the trial court.  This determination goes unchallenged on appeal.

The trial court held that SPA acted as Mr. Iversen's "alter ego." The test to determine if one is operating an entity simply as an alter ego was articulated in *Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*:

> This formulation involves two elements: "(1) that the corporation is not only influenced by the owners, but also that there is such unity of ownership and interest that their separateness has ceased; and (2) that the facts are such that an adherence to normal attributes, viz, treatment as a separate entity, of separate corporate existence would sanction a fraud or promote injustice."

360 S.W.3d 152, 161 (Ky. 2012) (citing *White*, 584 S.W.2d at 61-62, *overruled on other grounds by Inter-Tel*, 360 S.W.3d at 165).

In so finding, the court applied the factors as listed in *Bear Inc. v. Smith*, 303 S.W.3d 137, 148 (Ky. App. 2010). No one factor is dispositive, and not all factors must be present for a finding that the entity is acting as the alter ego of the individual. The enumerated factors should simply be utilized as guideposts for a court in analyzing the facts presented.

> Courts have identified several factors bearing on this first relationship such as (1) whether the corporation is inadequately capitalized, (2) whether the owners observe corporate formalities, (3) whether the corporation issues stock or pays dividends, (4) whether it operates without a profit, (5) whether there is a commingling of corporate and personal assets, (6) whether the owners use corporate assets as their own, or in general deal with the corporation at arms['] length, (7) whether there are non-functioning officers or directors, (8) whether the corporation is insolvent at the time of the transaction, (9) whether corporate records have been maintained, and

(10) whether others pay or guarantee debts of the corporation. No single factor is dispositive.

*Id.* (citation omitted).

Of these factors, courts have been encouraged to give the most emphasis to inadequate capitalization, a failure to observe formalities, and disregard of any distinction between the parent and the subsidiary, as well as a paramount control by the parent over the decisions of the subsidiary and its day-to-day operations. *See Inter-Tel*, 360 S.W.3d at 164.

The trial court noted that SPA apparently held no assets as all rental payments were consistently made to the Board on checks drawn from a personal checking account of the Iversens. Noting that the most proper time to adjudge whether an entity is adequately capitalized is at its formation, the court noted that there was no suggestion made by SPA that it was ever adequately capitalized and the fact of the consistent payments from the personal account provided more than adequate support for the conclusion that SPA was not properly capitalized to operate as an entity separate from Iversen. *See id.* at 167; 1 WILLIAM M. FLETCHER, CYCLOPEDIA OF LAW OF PRIVATE CORPORATIONS § 31 (2021).

The trial court held that SPA appeared to be insolvent and completely without assets. SPA argued that it was adequately financed through loans from Iversen, but as the court noted, such only actually buttresses the conclusion that Iversen operated SPA as his alter ego. No company records were provided to

-12-

establish any formality of operations – no minutes from meetings, or any other documentation. Lastly, Iversen admitted to paying all liabilities of SPA. Iversen was the operator of the business, and it is not alleged by Iversen that the concern had any other employee besides him, so he, of course, dictated day-to-day operations of the enterprise.

We do not disagree with the trial court's analysis and determination. Mr. Iversen operated SPA not at arm's length, but as if there was no separation between him and the entity. We hold that filing one form with the Secretary of State's office on a yearly basis is simply not sufficient, alone, to support a finding that one has separated himself from an entity of which he is the sole member such as to shield one from personal liability. As the court below noted, allowing Iversen to house his personal aircraft in the hangar leased by SPA and then avoid any payment of rent due would lead to unjust enrichment, another requirement before the veil shall be pierced.

Iversen argues consistently that there is nothing to support the determinations of the trial court as to the *Bear* factors. But one cannot simply rely upon the summary proceeding of a motion for judgment, and then argue that no evidence exists to support the Movant's position. Rather, the non-moving party must proffer something. "[A] party opposing a . . . summary judgment motion cannot defeat it without presenting at least some affirmative evidence showing that

there is a genuine issue of material fact for trial." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 482 (Ky. 1991).

Further, Iversen argues that there was no suggestion that SPA intended to defraud the Board at any time. This argument suggests that such is necessary before a finding can be made that Iversen was simply employing SPA as his alter ego. However, the law contains no such requirement. The Board does not argue, and does not have to argue, that Iversen intended to defraud the Board when the rental contracts were executed or when monthly rents were paid. There is simply no requirement that the intent to defraud be present. Rather, there must be a finding of fraud *or* injustice. It is the latter which the trial court found exists here; the court found that it would be unjust to allow Iversen to escape liability for the rentals due under the lease. This is particularly true when his own personal aircraft was lodged in the hangar for which rent is still due and owing, especially considering all rents had been paid from his personal account for the entirety.

The court noted that SPA had followed the particular requirements of the statutes in filing annual reports, but noted the very minimal nature of the requirements to remain in good standing as an LLC. Next, the court noted the absence of any suggestion that any proceeds had ever been distributed to the sole member, Iversen, remarking it would be difficult for an entity without a bank

account to pay out any distributions. Plus, the court noted, the entity had only ever reported a loss on tax returns and never any income or profit.

There was a clear commingling of assets, the court noted, as Iversen paid the debts of SPA from a personal bank account. The court noted it was not possible for Iversen to use the assets of the entity as his own as the entity had *no* assets. We would add that it is not consistent with acting at arm's length when a member of an LLC pays debts of the LLC from his personal account without even a nod to transferring funds to an account in the name of the entity. Whether such would be sufficient to establish an LLC as a distinct entity is not relevant here, but failing to even engage in such clearly indicates that Iversen did not keep a clear separation between himself as an individual and SPA as a separate entity. Further, if the veil were not pierced in such circumstances, it would allow one to pick and choose which obligations to satisfy without consequence; if the member could not be held personally responsible for the entity's debts, then any debt the member chose not to pay would be unrecoverable. Such is unjust.

Turning to the amount of the award in favor of the Board, Iversen complains that the amount the award was reduced was insufficient as the amount was only for materials Iversen purchased to make repairs to the hangars during the holdover term and there was no amount included to compensate him for the labor he expended in making the repairs. In so arguing, Iversen acknowledges that he

did not adduce any proof of a proper amount of recompense to the trial court. No evidence of any such costs was ever provided by Iversen nor was any specific claim for labor costs made in either the answer and counterclaim, the motion to dismiss, or the response to the motion for summary judgment. The amount the trial court recompensed Iversen for the repairs by reducing the award to the Board is affirmed.

Finally, as to the first order, Iversen complains of the grant of prejudgment interest to the Board. The rate of prejudgment interest can be a term negotiated between parties to a contract in the event litigation occurs, but such was not done in this case as there is no provision for prejudgment interest in the leases. When the parties do not stipulate by contract, the statutory rate of 8% can be applied by the court. KRS[10] 360.010(1). Iversen could have negotiated a lesser interest rate when negotiating the leases; however, he failed to do so.[11] The

---

[10] Kentucky Revised Statutes.

[11]         (2) Any party or parties to a contract or obligation described in subsection (1) of this section, and any party or parties who may assume or guarantee the contract or obligation, shall be bound, subject to KRS 371.190, for the rate of interest as is expressed in the contract, obligation, assumption, or guaranty, and no law of this state prescribing or limiting interest rates shall apply to the agreement or to any charges which pertain thereto or in connection therewith.

KRS 360.010.

-16-

provision of a statutory rate of interest by a trial court cannot be an abuse of discretion.[12]  The first order of the Pulaski Circuit Court is affirmed.

The second order of the trial court granted attorney's fees to the Board but granted an amount less than the Board sought.  In its order, the court subtracted any amount of attorney's fees representing hours billed for the two forcible detainer actions but granted fees for the hours billed towards the underlying collection litigation.  Iversen argues that the trial court's order as to the attorney's fees it did allow are improper, as the negotiated leases which provided for attorney's fees had expired.  The Board appeals the denial of attorney's fees for the forcible detainer actions.  We affirm the trial court on both awards.

The Board argues that Iversen waived the opportunity to complain about the award of any attorney's fees when he did not contest the Board's argument that it was entitled to attorney's fees in the Board's motion for summary judgment, wholly failing to address the issue in the response filed.  Further, the Board notes that Iversen did not raise the issue of the grant of attorney's fees when he filed a motion to amend, alter, or vacate following the entry of the first

---

[12] "The trial court may award prejudgment interest at any rate up to 8%, or it may choose to award no prejudgment interest at all, but it may not exceed the legal rate of 8%.  Thus, in awarding prejudgment interest at the rate of 12% per annum, the trial court has abused it[s] discretion." *Fields v. Fields*, 58 S.W.3d 464, 467 (Ky. 2001).

judgment, which granted attorney's fees in an amount to be determined at a later time.

We agree that Iversen waived any argument with the determination that attorney's fees would be awarded when he did not raise the issue until after the entry of the second order establishing the amount.[13] Thus, we will only consider whether the amount of attorney's fees awarded was proper. *See Fischer v. Fischer*, 348 S.W.3d 582, 588-89 (Ky. 2011), *abrogated by Nami Res. Co., L.L.C. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323 (Ky. 2018) ("If the specific ground complained of on appeal is not given at the trial court, then the movant has failed to preserve his thinking should the trial court rule against him, and there will be no record to establish that the court did not rely on other grounds that might suffice.").

In the second order, the court determined the requested amount of $99,322.14 in attorney's fees was not reasonable and was excessive, especially considering that counsel obtained a judgment in the amount of only $50,695.65 for the client. The court calculated a reasonable amount of attorney's fees to be $26,200. In reaching that figure, the court calculated a reasonable hourly rate for the area to be $200 per hour and, after reviewing invoices from the Board's counsel, the court determined one hundred and thirty-one (131) hours of time was

---

[13] In any event, the provisions of the expired lease, including for the payment of attorney's fees, remained in force during the holdover tenancy. *See Cass v. Home Tobacco Warehouse Co.*, *supra.*

an appropriate amount of time to have spent on the collection case, subtracting any fees for either of the two forcible detainer actions. Further, the court's order found Iversen to be personally liable for the amount of attorney's fees as the prior order had found him to be the alter ego of SPA.

The court determined the Board was not entitled to attorney's fees for the first forcible detainer because it had been procedurally infirm, one of the reasons it was never reduced to judgment. The court held that the Board was not entitled to attorney's fees for the second forcible detainer action because the Board did not request attorney's fees or file a bill of costs within ten (10) days of the entry of the judgment granting the Board possession of the hangars.

"Reasonableness of an attorney fee must encompass the time involved, the task assigned, and the degree of difficulty of the work under the circumstances. Reasonableness of attorney's fee is for the trial court to determine, subject only to the abuse of discretion." *Dingus v. FADA Serv. Co.*, 856 S.W.2d 45, 50 (Ky. App. 1993).

We do not find any of these determinations to be an abuse of discretion. We affirm the second order of the Pulaski Circuit Court, awarding attorney's fees to the Board in the amount of $26,200 and finding Mr. Iversen to be personally liable for the award.

## CONCLUSION

We affirm the orders of the Pulaski Circuit Court. The trial court properly entered summary judgment in favor of the Board. We find support for the amount of damages awarded and affirm the grant of prejudgment interest in the statutory amount. Further, the finding that Mr. Iversen be personally liable is affirmed as he was operating the LLC as a mere alter ego. We affirm the dismissal of Mrs. Iversen from the litigation, finding she was not a member of the LLC or involved in the entity in any way, other than being a co-owner of the checking account with her husband from which all liabilities of the alter ego LLC were paid. Finally, we affirm the amount of the attorney's fees awarded and owed by Iversen personally, finding that they were not an abuse of discretion.

ALL CONCUR.

| BRIEFS FOR APPELLANTS/CROSS-APPELLEES: | BRIEF FOR APPELLEE/CROSS-APPELLANT: |
|---|---|
| | T. Morgan Ward, Jr. |
| Winter R. Huff | Bethany A. Breetz |
| Somerset, Kentucky | Louisville, Kentucky |
| | |
| | Cassandra L. Welch |
| | Covington, Kentucky |