RENDERED:  OCTOBER 13, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0741-MR

RODNEY J. SABO                                                          APPELLANT


                    APPEAL FROM KENTON CIRCUIT COURT
v.                  HONORABLE KATHLEEN LAPE, JUDGE
                    ACTION NO. 16-CI-00917


MICHAEL STAFFORD                                                        APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  EASTON, LAMBERT, AND McNEILL, JUDGES.

LAMBERT, JUDGE:  This appeal arises from four orders related to a real estate

purchase contract between the purchaser, Michael Stafford, and a real estate

company.  We reverse and remand for dismissal.

The underlying action began on June 2, 2016, with the filing of a two-

count complaint in the Kenton Circuit Court by Stafford against several

defendants, including The Tanner Group, LLC; The Reserves of Buttermilk

Council of Co-Owners, Inc., a homeowners association (the HOA); Steven J.

Megerle (who was also the registered agent for The Tanner Group); Ben Schreiber; Rodney J. Sabo; Ryan Brzygot (Ryan); Scott Brzygot (Scott); and Queen City Court, LLC. Megerle, Sabo, Schreiber, Ryan, and Scott were members of Queen City Court. Queen City Court provided subcontracted work to both The Tanner Group and the HOA, which companies were owned by some or all of the individuals listed in the complaint as defendants.

In his complaint, Stafford alleged that on October 14, 2014, Stafford entered into a contract with Queen City Court to purchase a condominium and paid $150,000.00 for the property in several installments to Queen City Court. The defendants, Stafford alleged, kept the $150,000.00 he paid but did not apply it to the purchase contract pursuant to their agreement. For the first count, Stafford alleged that the defendants had breached the purchase contract when they accepted payment from him but failed to close the sale. For the second count, Stafford alleged that Queen City Court had fraudulently entered into the purchase contract without any intent to fulfill its obligations and that the defendants were all aware of this fraudulent intent but accepted Stafford's payments. As a result, Stafford sustained monetary damages, which he sought against the defendants, as well as punitive damages for intentional fraud, costs, and attorney fees.

On June 23, 2016, Stafford filed a notice of partial dismissal, under Kentucky Rules of Civil Procedure (CR) 41.01(1), of defendant Megerle, noting

that he had not answered the complaint or filed a motion for summary judgment. As to defendant Sabo, the court assigned a special process agent, and then appointed a warning order attorney, to serve him. Sabo filed an answer on June 12, 2017, generally denying the allegations in Stafford's complaint and raising several affirmative defenses. These defenses included that any actions Sabo took were in his capacity as a member of Queen City Court, not on his own behalf, and that Stafford failed to mitigate his damages by failing to assert his rights and interests in a foreclosure action filed by Central Bank & Trust Co. (Central Bank) in 2015, for which he had actual and constructive knowledge.

In March 2018, Sabo filed a motion for summary judgment, arguing that there were no genuine issues of material fact and that he was entitled to a judgment as a matter of law. In support of his motion, Sabo included his affidavit. In the affidavit, Sabo explained that Queen City Court was a limited liability company that had been organized in 2007 and had shut down operations and gone out of business in late 2015. He had been one of the three members/owners. In June 2014, he (on behalf of Queen City Court as one of the members) and Stafford signed a purchase contract for a condominium in Crescent Springs, Kentucky. Sabo stated that he was not a party to the purchase contract and that he had never had any type of contract or agreement with Stafford. He said he had not lied to Stafford or misrepresented any facts regarding the purchase, and he had every

intention of selling the condominium to him when Queen City Court entered into the contract with Stafford. Sabo did not personally receive any funds Stafford had paid under the contract with Queen City Court for the property. He said that Queen City Court had its own bank account, in which the funds Stafford paid were deposited. Queen City Court's funds from Stafford were not co-mingled with any of Sabo's personal accounts or funds, and he believed that Queen City Court had used the funds it received from Stafford to build out the condominium he intended to purchase and to pay the company's expenses. Queen City Court lost ownership of the condominium (and its other real estate in that development) in a foreclosure action filed by Central Bank in 2015. He said that Queen City Court was overextended on its debt and went out of business when the Central Bank foreclosed on the company's assets. Sabo did not receive any payments or assets from Queen City Court when the company went out of business as it no longer had any assets.

On the basis of the facts set out in the affidavit, Sabo argued that he was entitled to a summary judgment as a matter of law. He asserted that the breach of contract claim failed because Sabo and Stafford had not entered into a contract with each other, and Stafford had alleged in his complaint that he had entered into a contract with Queen City Court, not Sabo. In addition, as a member of a limited liability company, he could not be held personally liable for action the company

-4-

had taken, citing Kentucky Revised Statutes (KRS) 275.150 and *Pannell v. Shannon*, 425 S.W.3d 58 (Ky. 2014). Similarly, Stafford's claim for fraud failed because he did not allege that Sabo had made any misrepresentations of fact to him.

In his response, Stafford argued that Sabo should be required to provide meaningful responses to his discovery requests, including providing financial information that may show that Sabo had comingled his assets and received benefits from the contract with Stafford. In addition, he argued that without Sabo's answers, it would not be clear whether Queen City Court appropriately applied its assets to the debts accrued or distributed the assets to Sabo or the other members. Stafford went on to argue that he had not been given notice of the dissolution of Queen City Court and, therefore, could not make a claim against it. As to the fraud claim, Stafford again stated that this claim would depend on the financial records that had not been produced. Stafford had paid $100,000.00 of the $150,000.00 purchase price less than two months before the foreclosure proceedings were initiated.

In his reply, Sabo stated that Stafford failed to produce any counter-affidavits or other admissible evidence that would create a genuine issue of material fact. He only offered conjecture. And he did not address the legal

arguments that Stafford made in his motion. Finally, Stafford had had ample time to conduct discovery.

On April 23, 2019, the circuit court entered an order denying the motion for summary judgment, finding that there were disputed facts and issues in the case. The court apparently agreed with Stafford's arguments that Sabo had not fully answered his discovery requests and that "it is not clear if Queen City Court, LLC has assets or if the parties appropriately adhered to the purchase contract." The court also ordered Sabo to fully answer the interrogatories and requests to produce within 30 days.

In February 2020, Stafford moved to voluntarily dismiss, without prejudice, all of the named defendants, except Sabo, pursuant to CR 41.01. He stated that the rest of the defendants had sought relief through bankruptcy filings or were unable to be located. The court granted the motion the following month and adjudged that the proper party defendant was Sabo. The remaining defendants were dismissed with prejudice. In July 2020, Stafford moved the court to set the matter for a trial.

Sabo filed a renewed motion for summary judgment in July 2020, relying upon the affidavit filed with the previous motion as well as his responses to Stafford's interrogatories. In his answer to interrogatory No. 13, Sabo stated:

> Sabo was not involved in the negotiation or execution of
> Plaintiff's purchase contract with Queen City Court,

LLC. All such matters were handled exclusively by Ryan Brzygot, the managing member of Queen City Court, LLC. Sabo did not even know Plaintiff's name until approximately one year after Plaintiff had signed a contract with Queen City Court, LLC and paid monies to Tanner Group, a separate business owned by Ryan Brzygot. To the extent Plaintiff has any viable claims in this case, those claims may be against Queen City Court, LLC, Central Bank & Trust Co. and/or Ryan Brzygot, but definitely not Sabo.

In his answer to interrogatory No. 16, Sabo stated that he had not personally accepted any payment for or from Stafford, but he was aware that Queen City Court, LLC had done so. In his response to interrogatory No. 20 regarding the factual basis of each defense he would assert, Sabo stated:

Sabo was not involved in the negotiation of Plaintiff's purchase contract but did sign that contract on behalf of Queen City Court, LLC. However, Sabo did not even know Plaintiff's name until approximately one year *after* Plaintiff signed his contract with Queen City Court, LLC. Sabo did not mislead, defraud or lie to Plaintiff regarding his purchase of a condominium from Queen City Court, LLC, nor did Sabo receive or retain any monies that Plaintiff paid to Queen City Court, LLC for the condominium. Basically, Queen City Court, LLC used the monies received from Plaintiff to build out the condo that Plaintiff intended to buy and to pay the company's expenses. Ultimately Queen City Court, LLC got overextended on its debt and went out of business when the bank foreclosed on its assets, including the condo that Plaintiff was trying to purchase. It is Sabo's understanding that Plaintiff had notice and knowledge of the foreclosure case filed by Central Bank & Trust Co. in Kenton Circuit Court, Case No. 15-CI-00052, but never took any action to protect whatever rights or interests he had or may have had in the condominium. Queen City

-7-

Court, LLC has been defunct and out of business since late 2015.

In the memorandum supporting his renewed motion, Sabo stated that after the circuit court denied his first motion for summary judgment, he complied with the court's order and served amended discovery responses on Stafford. He produced 32 additional documents totaling 512 pages. Stafford had taken no further action, other than moving to dismiss the other defendants and to set the matter for trial. Sabo argued that there was no evidence to support Stafford's claims and that he was entitled to a judgment in his favor on both claims for the same reasons set forth in the original motion.

Stafford responded to the motion and argued that genuine issues of material fact remained to be decided. He asserted that it was unclear that Sabo was not a party to the purchase contract, noting that his signature appeared on the signature block, and Sabo admitted that he was a member in Queen City Court. Therefore, the facts of Sabo's involvement in the contract remained disputed. Stafford also argued that he had sufficiently stated his fraud claim with particularity. He stated that Sabo "eagerly accepted Plaintiff's timely payments with full knowledge of the loan situation of his company of which he was a member or agent. . . . The lack of performance on behalf of [Sabo] is direct evidence of this fraud and the intent to never transfer title or close on the property with Plaintiff."

In reply, Sabo argued that Stafford had still not come forward with any evidence in response to his renewed motion and had failed to sustain his burden of producing admissible evidence to establish a genuine issue of material fact.

The circuit court entered an order on August 13, 2021, again denying the motion due to the existence of disputed facts and issues. The court based this holding on the following:

> Stafford argues that Sabo signed the contract and is liable. This Court notes that Kentucky has long held that a corporate veil can be pierced under certain circumstances. Secondly, Stafford argues that based on the timing of the foreclosure and the last payment of the deposit, this contract was entered into under false or misleading circumstances, namely that based on the timing of the foreclosure, Sabo had to be aware of the financial issue of the Tanner Group. Foreclosure was filed approximately six months after the contract with Stafford was signed (January 8, 2015).

A bench trial was scheduled for early 2022.

In his trial brief, Sabo set forth the factual circumstances for Stafford's breach of contract and fraud claims. He also addressed piercing the corporate veil, which he stated Stafford had not asserted as a claim. Sabo argued that Stafford could not sustain his burden of proof as Queen City Court had been a viable limited liability company organized in Kentucky in 2007 until its administrative dissolution in October 2016; it had a written operating agreement

that had been signed by its members; the members properly capitalized the company; it filed annual reports with the Kentucky Secretary of State; it filed tax returns; and it maintained its bank account separate and apart from its members' personal accounts without any comingling of company funds. Sabo argued that Stafford could not prove a domination of the company that resulted in the loss of corporate separateness between Queen City Court and Sabo, or any circumstances that would sanction fraud or promote injustice if the corporate entity continued to be recognized. Sabo noted that Queen City Court had been dismissed with prejudice from the case on Stafford's motion, which precluded Stafford from securing a judgment against the only other party to the contract. Sabo sought dismissal of the action. In his trial brief, Stafford argued that Sabo should be held individually liable due to fraud and unfair hardship.

The court held a bench trial on April 22, 2022. Stafford testified first. He testified that he had entered into a written contract with Sabo to purchase the condominium. Pursuant to the contract, he made payments during the construction process totaling $150,000.00, which was the entire amount of the purchase price. He principally dealt with Sabo on purchasing the property. He never closed on the property or had his name put on the deed. Stafford made payments to the HOA, and he spent another $25,000.00 on improvements. He lived in the unit for two and a half years. Stafford realized the condominium was never going to be put into

-10-

his name when he got a letter from Central Bank that it had foreclosed on the property. He had never received prior notice about problems with finances or the transfer. Central Bank wanted to work out a deal with him to repurchase the property. Stafford wanted the money back that he had paid to Sabo. When he found out about the foreclosure, Stafford contacted the president of the HOA, who told him they had had issues with Sabo as well and described him as "crooked." Sabo did not tell him what he did with the $150,000.00, and he told Stafford to get an attorney.

On cross-examination, Stafford stated that he made the payments to Sabo. A copy of a check introduced into evidence showed that it was made payable to Queen City Court. The first payment was made in October 2013, and the second payment was made in January 2014. In 2013, he had not met Sabo but was aware of him. He said he met with Sabo and Ryan to discuss the payments and the contract. In the June 2014 contract, Sabo signed it as a member of Queen City Court. A different version of the contract, related to deposits and the closing, was signed in October. Stafford learned of the foreclosure in early 2015, but Sabo never told him about it. He testified that checks that he wrote for $5,000.00 on October 6, 2014, were made payable to Queen City Court. Stafford stated that the only contract they acted under was from October 2014. He did not have any personal interaction with anyone from Queen City Court other than Sabo.

Sabo testified next on cross-examination. He is a residential building designer. He first came into contact with Stafford in June 2014 as a member of Queen City Court; there was a purchase contract with Ryan, who was the managing member of Queen City Court, for the sale of the property. The purchase contract was amended in October 2014. Sabo became aware that Stafford had written checks to Tanner Homes and Queen City Court. The money was placed in Queen City Court's bank account. Sabo was unable to transfer ownership to Stafford because the bank would not release the property. Sabo recommended that Stafford get an attorney once the foreclosure notice was received in order to protect his rights to his unit. Up through September 2015, the company continued to negotiate with the bank to sell other units and to release Stafford's units. The company did what the bank asked, including paying off liens. When asked whether Queen City Court was undercapitalized, Sabo said that at a point in time, the company did not have enough money to face the legal defense against the bank in addition to continuing to make other payments. The bank had demanded that the company pay off the construction loan. The payments Stafford made went directly to completing the condominium, to the vendors, and to the bank. The last payment had been received before the foreclosure action was filed. Sabo did not have with him any evidence of the money Stafford paid going into Queen City Court's account.

At the close of Stafford's case, Sabo moved to dismiss the action pursuant to CR 41.02. Stafford alleged in his complaint that he had a contract with Queen City Court; there was no allegation or evidence that there was a contract with Sabo, individually. And there was no evidence of any payment to anyone but Queen City Court. All other defendants, including Queen City Court, were voluntarily dismissed because Stafford did not take the time to find or serve them. Under Kentucky law, members of an LLC cannot be held personally responsible for financial affairs of the company. And Stafford had not introduced any evidence that Sabo had misrepresented any fact. Stafford had not plead a claim for piercing the corporate veil, and he had never moved to amend his pleadings to assert that claim. Stafford had notice and knowledge of the foreclosure but did nothing, and the court in the foreclosure action found that the residents had been duly served. In response, Stafford argued that Queen City Court had already dissolved before the lawsuit was filed. He argued that it was not equitable that he should lose the $150,000.00. The court denied the motion to dismiss, finding that enough evidence had been presented to go forward.

In his case in chief, Sabo continued his testimony on direct examination. He testified about the formation of Queen City Court in 2007, the roles of the members, and the various changes that resulted in his having a 10% ownership in the company by 2011. He also testified about capitalization and that

he had contributed $25,000.00 when it was formed. Other members also made contributions to the company. He introduced Queen City Court's financial records, and based on the balance sheets, Sabo believed the company was adequately capitalized in 2013 and 2014. Sabo never removed money from the LLC. In 2014/2015, Sabo's office took over managing the books from Ryan and his bookkeeper, and Sabo's staff prepared the documents to give to the accountants. Sabo was not a check signer on the LLC's bank account until June of 2014. He had never seen any member of the LLC use the LLC's bank account for personal purposes. As to corporate formalities, Sabo introduced evidence that the LLC had filed tax returns for years 2010 through 2015. The practice was for documents to be signed in Queen City Court's name.

In 2013/2014, Sabo first heard of Stafford through Ryan as a potential buyer. Sabo was not involved in the initial negotiations with Stafford, and they met for the first time in June 2014. He took on a more aggressive role at that time to figure out who Stafford was and to force the sale to happen, stating that the bank wanted to see contracts and purchases. He arranged the meeting among him, Stafford, and Ryan. That was the first time Sabo discovered that Stafford had written any checks. This "exposed" Ryan as having received checks that the others did not know about. Sabo learned one of the checks (dated October 16, 2013, for $25,000.00) was written to Tanner Custom Homes, which Sabo thought was

improper. Once he found out how much money Stafford had paid, he asked Ryan for an accounting to see what had been done on the unit Stafford was purchasing. He had seen a contract but not a signature sheet. Sabo asked about the signed contract, but Stafford did not know anything. Because the dates on the original contract had passed, Sabo worked to get Stafford's signature on a new version of the contract in order to move forward on the construction and close the sale on the property. Sabo and Stafford signed the June 23, 2014, purchase contract, with Sabo signed the contract as a member of Queen City Court. Sabo never signed any documents as "seller," only as a member, as he did not have the right to personally convey title to the property. In October 2014, Sabo signed a deposit agreement acknowledging payments Stafford made. None of these payments went into his pocket or personal bank account. A second contract was signed in October of that year for housekeeping purposes, as the dates and amounts were off. When he signed the June 2014 contract, Sabo's intent was for the unit to be sold. Once the contract was signed, they immediately began work to finish the unit. Sabo was annoyed with Ryan for not doing the construction and taking the checks without telling them.

In August 2014, a forbearance agreement was entered into with the bank so that construction could continue and the units could be completed and sold, including the unit Stafford was buying. Although Queen City Court was

-15-

meeting the obligations under the forbearance agreement and working to complete and sell the other units, in January 2015, the bank decided to foreclose on the property. In response, Queen City Court hired attorneys to represent it in the foreclosure action and negotiate with the bank. Sabo thought the bank had breached the forbearance agreement as the liens were being paid and that the bank should have permitted the sale of the units to pay off the construction loans. But the bank was not willing to release its lien on Stafford's property.[1] Because Stafford had paid Queen City Court for the unit, Sabo thought the bank should have released the unit so that it could be transferred to Stafford. Sabo stated that he had discussed the foreclosure with Stafford in early 2015 when the action was filed. Stafford told him he had received a notice, and Sabo suggested that he contact an attorney to protect his assets.

The bank eventually was successful in its foreclosure action, and Queen City Court shut down in March of 2016. Sabo lost over $93,000.00 due to the closure of the company, and his bank account was garnished (another member's was garnished until he filed for bankruptcy). Both Ryan and Scott filed for bankruptcy. Queen City Court had never received a notice of default from

---

[1] Stafford had moved into his completed unit just before the certificate of occupancy was obtained in March 2015.

-16-

Stafford pursuant to the purchase contract, and Stafford never indicated that he wanted to end the contract. Sabo did not call any other witnesses.

In closing, Stafford argued that he had established his claims of breach of contract and fraud. Sabo disputed that he was personally liable under a contract entered into by Queen City Court, and he argued that there was no evidence of any misrepresentation. The court ordered the parties to file proposed findings of fact and conclusions of law.

On June 17, 2022, the circuit court entered its findings of fact and conclusions of law in which it found in favor of Stafford on all claims, including piercing the corporate veil. It found Sabo to be individually liable for fraud and breach of contract, and it awarded Stafford a judgment in the amount of $150,000.00 plus interest from the date of the judgment. This appeal now follows.

On appeal, Sabo argues that the circuit court should have granted his CR 41.02(2) motion to dismiss during the trial, that its findings of fact and conclusions of law were clearly erroneous and were not supported by substantial evidence, and that it should have granted his motions for summary judgment.

Sabo's first argument addresses whether the circuit court properly denied his motion to dismiss pursuant to CR 41.02(2) due to Stafford's failure to submit any evidence to support a finding that Sabo could be held personally liable on his breach of contract and fraud claims. That rule provides:

> In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52.01.

In *Morrison v. Trailmobile Trailers, Inc.*, 526 S.W.2d 822, 823-24 (Ky. 1975), the former Court of Appeals explained the application of CR 41.02(2) in bench trials:

> The quoted section of the rule [CR 41.02(2)] allows the trial court to determine the facts, and if judgment is rendered against the plaintiff on the merits it is required to make findings as directed by CR 52.01. As a result of this provision, the trial court in such cases must weigh and evaluate the evidence. The trial court does not, as in the case of a motion for a directed verdict, indulge every inference in the plaintiff's favor.
>
> CR 43.01 placed the burden and risk of non-persuasion on the appellant as to the issues upon which the trial court made findings. CR 52.01 limits our review to the question of whether those findings are clearly erroneous and admonishes us to give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

"We review dismissals under CR 41.02 for abuse of discretion. Under this standard of review, we will reverse the trial court's dismissal only if it was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Jones v. Pinter*, 642 S.W.3d 698, 701 (Ky. 2022) (citations in footnotes omitted).

Sabo argues that Stafford rested his case-in-chief without submitting any evidence that supported holding him personally liable on either the breach of contract or fraud claims. He asserts that, at best, Stafford established a breach of contract claim against Queen City Court, as the evidence presented established that Sabo signed the October 2014 purchase contract on behalf of Queen City Court, not in his individual capacity. Sabo also asserts that Stafford did not introduce clear and convincing evidence (or any evidence) to establish a fraud claim against him, noting that Stafford's own evidence supports that he had agreed to purchase the property in October 2013 and had made $50,000.00 in payments prior to signing the October 2014 purchase agreement. In addition, Stafford did not introduce any evidence of any lie or misrepresentation Sabo made to him. After our careful review of the record, we must agree with Sabo that the evidence does not support the trial court's conclusions that Stafford met his burden of proving these two claims.

As to the trial court's decision to pierce the corporate veil in this case, we also agree with Sabo that the evidence did not support such a drastic action. We shall consider this issue as it relates to Sabo's motion to dismiss as well as the propriety of the final judgment. Our standard of review of a final judgment entered following a bench trial is set forth in *Tavadia v. Mitchell*, 564 S.W.3d 322, 326 (Ky. App. 2018):

> [O]ur review is based upon the clearly erroneous standard set forth in CR 52.01, which provides that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." "If the trial judge's findings of fact in the underlying action are not clearly erroneous, *i.e.*, are supported by substantial evidence, then the appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney*, 20 S.W.3d 471, 473-74 (Ky. 2000). However, reversible error arises when there is no substantial evidence in the record to support the findings of the trial court. *M.P.S. v. Cabinet for Human Resources*, 979 S.W.2d 114, 116 (Ky. App. 1998). Notwithstanding the deference due the trial court's factual findings, its conclusions of law reached after making its findings are reviewed *de novo*. *Hoskins v. Beatty*, 343 S.W.3d 639, 641 (Ky. App. 2011).

(Footnote omitted.)

In *Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC*, 360 S.W.3d 152, 155 (Ky. 2012), the Supreme Court of Kentucky extensively addressed the doctrine of piercing the corporate veil, explaining:

> Piercing the corporate veil is an equitable doctrine invoked by courts to allow a creditor recourse against the shareholders of a corporation. In short, the limited liability which is the hallmark of a corporation is disregarded and the debt of the pierced entity becomes enforceable against those who have exercised dominion over the corporation to the point that it has no real separate existence. A successful veil-piercing claim requires both this element of domination and circumstances in which continued recognition of the corporation as a separate entity would sanction a fraud or promote injustice.

-20-

*Id.* at 155. The Court went on to explain how to invoke this doctrine:

> A Kentucky trial court may proceed under the traditional alter ego formulation or the instrumentality theory because the tests are essentially interchangeable. Each resolves to two dispositive elements: (1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice. In assessing the first element, the courts should look beyond the five factors enumerated in [*White v. Winchester Land Development Corp.*, 584 S.W.2d 56 (Ky. App. 1979),] to the more expansive lists of factors discussed *supra*. As to the second element, the trial court should state specifically the fraud or injustice that would be sanctioned if the court declined to pierce the corporate veil.

*Inter-Tel*, 360 S.W.3d at 165. The expansive lists referenced above are set forth, in part, below:

> Beyond Kentucky, veil-piercing generally focuses on the same instrumentality, alter ego and equities factors tests explored in *White*, with the alter ego formulation appearing to be the most common test, always employed in conjunction with consideration of various equities factors. The Seventh Circuit Court of Appeals, when applying Illinois law, uses the two-part alter ego test and considers the following factors under the first prong of that test:
>
> > (1) inadequate capitalization; (2) failure to issue stock; (3) failure to observe corporate formalities; (4) nonpayment of dividends; (5) insolvency of the debtor corporation; (6) nonfunctioning of the other officers or directors; (7) absence of corporate records; (8) commingling of funds; (9) diversion of

> assets from the corporation by or to a stockholder or other person or entity to the detriment of creditors; (10) failure to maintain arm's-length relationships among related entities; and (11) whether, in fact, the corporation is a mere facade for the operation of the dominant stockholders.
>
> *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008) (citing *Fontana v. TLD Builders, Inc.*, 362 Ill.App.3d 491, 298 Ill.Dec. 654, 840 N.E.2d 767, 778 (2005)). This expanded list is more reflective of the evolving considerations as to the so-called equities factors than the five simple factors in *White*.

*Inter-Tel*, 360 S.W.3d at 163 (footnote omitted).

In sum, "a trial court should examine the factors with more emphasis placed on three factors: grossly inadequate capitalization; egregious failure to observe corporate formalities; and a high degree of control over the corporation's day-to-day operations and decisions." *Tavadia*, 564 S.W.3d at 329 (citing *Inter-Tel*, 360 S.W.3d at 164). And regarding the fraud element, the *Tavadia* Court states:

> To assess the second element, "the trial court should state specifically the fraud or injustice that would be sanctioned if the court declined to pierce the corporate veil." [*Inter-Tel*, 360 S.W.3d] at 165. Although evidence of actual fraud is not required to meet this element, "the injustice must be something beyond the mere inability to collect a debt from the corporation." *Id*.

*Tavadia*, 564 S.W.3d at 329.

-22-

In the present case, the circuit court – albeit after the trial had concluded – relied upon the factors in *White* to determine that the corporate veil should be pierced in this case. It stated:

> Queen City [Court], LLC was undercapitalized at the time of formation and did not have sufficient funding to support its operations and debts owed. By 2012, Queen City [Court], LLC was already operating at a loss. For four years, between 2012 and 2016, the Defendant operated at a loss. In other words, it lacked the necessary assets to pay its creditors. Although the second prong is more relevant to corporations than LLC's [sic], Defendant fails to show Queen City [Court], LLC followed corporate formalities such as holding regular meetings, documenting those meetings, and keeping detailed financial records. Defendant produced financial statements that are already public information and produced no recordings or any written minutes or memorandum regarding important decisions. Defendant had a personal guarantee of the corporate liabilities in his individual capacity. The owners failed to treat the business as a separate entity. Sabo claims the $150,000.00 paid by Stafford was paid to a construction company to pay off debts without providing evidence to support this claim.
>
> With regard to the fraud element, courts hold individual owners liable if such owners use the corporation to knowingly defraud others and use the corporate persona as a shield to liability. This is what occurred here. Sabo fraudulently and knowingly took Stafford's money at the end of the company's lifetime and is now trying to use his status as a limited liability member of Queen City [Court], LLC to escape liability.

Sabo addresses the shortcomings of the findings and conclusions on pages 10 through 14 of his brief. Our review of the trial confirms that he is correct.

-23-

None of the findings in the above quoted passage from the circuit court's final judgment, as they relate to the factors a court must consider in deciding whether the corporate veil should be pierced, are supported by the record and, accordingly, are clearly erroneous. Therefore, we hold that the circuit court improperly pierced the corporate veil and improperly concluded that Sabo was personally liable in this case.

In addition, we are troubled in that Stafford never formally made a claim to pierce the corporate veil, either in his original complaint or by filing a motion to amend his complaint to include this cause of action. Rather, it appears that the circuit court raised this issue prior to the trial in an earlier ruling. But Stafford did nothing to actually add such a claim to his action.

In *Morgan v. O'Neil*, 652 S.W.2d 83, 85 (Ky. 1983), the Supreme Court of Kentucky confirmed that a claim to pierce the corporate veil must be specifically alleged:

> No allegations appear in the complaint to state a claim on "piercing the corporate veil." Likewise, the complaint made no allegation of any statutory basis to impose personal liability upon O'Neil, the sole shareholder in the corporation.
>
> While Count I of the amended complaint alleges "that the Defendant Corporation was dissolved in derogation of Kentucky Statute KRS 271 A.460," KRS 271A.460 merely sets out the procedural requirements which must be met in order to dissolve a corporation and places no duty whatsoever on the stockholders. *No*

*allegation was made that O'Neil was an officer of the corporation.* The bland allegation in the pleadings that O'Neil, the sole shareholder in the corporation, allowed the corporation to proceed through dissolution procedures while having knowledge of the claim of the Plaintiffs is not sufficient to state a cause of action so as to impose personal liability on the shareholders for the payment of the Indiana judgment.

Holding a shareholder in a corporation individually liable for a corporate debt is an extraordinary procedure and should be done only when the strict requirements for imposing individual liability are met. While it is true that the Rules of Civil Procedure with respect to stating a cause of action should be liberally construed and that much leniency should be shown in construing whether a complaint on which a default judgment is based states a cause of action, this Court cannot read away the requirement of Civil Rule 8.01 which requires ". . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." There must be maintained some minimum standard in the art of pleading which must be met. *Pike v. George*, Ky., 434 S.W.2d 626 (1968); *Johnson v. Coleman*, Ky., 288 S.W.2d 348 (1956).

Stafford never made a formal claim to pierce the corporate veil in this case, and the circuit court, in turn, erred as a matter of law in considering this non-alleged claim.

Finally, we agree with Sabo that the circuit court appears to have improperly imposed the burden of proof regarding piercing the corporate veil on him rather than on Stafford. "The burden of proof to demonstrate grounds for piercing the corporate veil is on the party seeking to impose liability on the parent corporation." *Tavadia*, 564 S.W.3d at 328 (quoting *Pro Tanks Leasing*, 988 F.

-25-

Supp. 2d 772, 783 (W.D. Ky. 2013) (citing *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 724 (6th Cir. 2007))). In the passage from the final judgment quoted above, the court noted that **Sabo** failed to show that Queen City Court followed corporate formalities, failed to produce any recordings of important decisions, and failed to produce evidence that the funds Stafford paid went to a construction company to pay off debts. However, it was **Stafford's** burden to produce evidence relating to the factors, not Sabo's burden to prove that the corporate formalities were met. This is especially true here because Stafford did not produce evidence of these failures, and the circuit court should not have shifted the burden to Sabo to establish the opposite.

For these reasons, we hold that the circuit court erred as a matter of law when it denied Sabo's motion to dismiss pursuant to CR 41.02(2) at the close of Stafford's case-in-chief and in finding in Stafford's favor in the final judgment. While we certainly sympathize with Stafford's loss of a considerable amount of money, there is simply no evidence to justify piercing the corporate veil and holding the sole remaining defendant liable for the entire amount of damages after the other defendants were dismissed on Stafford's motion. Based upon this holding, we need not address the court's rulings on Sabo's motions for summary judgment.

-26-

For the foregoing reasons, the judgment of the Kenton Circuit Court is reversed, and this matter is remanded for dismissal of the action against Sabo.

ALL CONCUR.


BRIEFS FOR APPELLANT:

Robert A. McMahon
Cincinnati, Ohio

BRIEF FOR APPELLEE:

Darrell Cox
Covington, Kentucky